Jennie Lee Anderson (SBN 203586)
**ANDRUS ANDERSON LLP**
155 Montgomery Street, Suite 900
San Francisco, California 94104
Tel: 415-986-1400
jennie@andrusanderson.com

Myron M. Cherry (SBN 50278)
Jacie C. Zolna (*pro hac vice*)
Benjamin R. Swetland (*pro hac vice*)
**MYRON M. CHERRY & ASSOC., LLC**
30 North LaSalle Street, Suite 2300
Chicago, Illinois 60602
Tel: 312-372-2100
mcherry@cherry-law.com
jzolna@cherry-law.com
bswetland@cherry-law.com

*Counsel for Plaintiffs and the Other Class Members*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AGUILAR AUTO REPAIR, INC. and CENTRAL COAST TOBACCO COMPANY, LLC, individually and on behalf of all others similarly situated, | Case No. 3:23-cv-06265-AMO<br><br>Hon. Araceli Martinez-Olguin<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF:**<br><br>(1) California Invasion of Privacy Act (Cal. Penal Code § 630, *et seq.*) |
| Plaintiffs, | |
| v. | |
| WELLS FARGO BANK, N.A., PRIORITY TECHNOLOGY HOLDINGS, INC., PRIORITY PAYMENT SYSTEMS, LLC, and THE CREDIT WHOLESALE COMPANY, INC., | |
| Defendants. | |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Aguilar Auto Repair, Inc. and Central Coast Tobacco Company, LLC bring this class action individually and on behalf of all others similarly situated, against Defendants Wells Fargo Bank, N.A. ("Wells Fargo"), Priority Technology Holdings, Inc., Priority Payment Systems, LLC (together "Priority"), and The Credit Wholesale Company, Inc. ("Wholesale"). Plaintiffs make the following allegations upon personal knowledge as to their own acts and upon information and belief and its attorneys' investigation as to all other matters:

**INTRODUCTION**

1.    Plaintiffs are California small businesses that were secretly recorded during telemarketing cold calls made by Wholesale on behalf of Wells Fargo and Priority. This conduct was illegal because, under the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq.*, California is a "two-party state" that requires a call recipient's consent before a call can be recorded.

2.    Wells Fargo runs a nationwide payments processing business. This business processes millions of credit and debit card transactions that occur at businesses around the country every day.

3.    Wells Fargo employed Priority and Wholesale to manage, market, and sell its credit and debit card processing services to businesses in California and around the United States.

4.    Wholesale is a sales and marketing company. Every day, Wholesale placed thousands of telemarketing cold calls to small businesses with the goal of scheduling in-person appointments where sales agents would pitch Wells Fargo's payment processing services. Wholesale recorded these appointment-setting phone calls without ever warning the recipients.

5.    Priority is a "processor" that manages technological infrastructure for Wells Fargo's payments business, provides back-end customer service and support, and oversees sales and marketing companies like Wholesale. Priority supervised Wholesale's sales activities, including its appointment-setting telemarketing calls, on behalf of Wells Fargo.

6.    The payments processing industry is self-regulated by Visa, Inc. and Mastercard International, Inc. Both of these payment networks publish extensive regulations that define the roles of banks, processors, and sales companies like Wells Fargo, Priority, and Wholesale.

7.    Under these Rules, the relationship between Wells Fargo and Wholesale and Wells Fargo and Priority is one of principal and agent. Wells Fargo explicitly registered both Wholesale and Priority as its agents and the parties conducted themselves as principal and agent. At all relevant times, Wells Fargo had the power to control Wholesale's and Priority's work.

8.    Every secretly recorded phone call was a violation of the California Invasion of Privacy Act, Cal. Penal Code § 630 *et seq*.

9.    Plaintiffs bring this action seeking remedy for Defendants' illegal practices.

**JURISDICTION AND VENUE**

10.    This class action is brought pursuant to Federal Rule of Civil Procedure 23 and California Code of Civil Procedure § 382. The monetary damages sought by Plaintiffs exceed the jurisdictional requirements of the Superior Court and the United States District Court for the Northern District of California. They will be established by the proofs at trial.

11.    The Superior Court of the State of California, County of San Francisco, may exercise jurisdiction over this action under Article VI, Section 10, of the California Constitution, which grants this superior court "original jurisdiction in all other causes" except those given by the statute to other courts. The California Invasion of Privacy Act, Cal. Penal Code § 630 *et seq*., does not grant jurisdiction to any other court or tribunal.

12.    The United States District Court for the Northern District of California has jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because the proposed classes involve thousands of California small businesses, the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and one member of the proposed class is a citizen of a state different than any one defendant.

13.    This Court has personal jurisdiction over Wells Fargo Bank, N.A. because its principal place of business is 420 Montgomery Street, San Francisco, California, and it is at home

there. Wells Fargo further operates its payments processing business in the state of California in a continuous and systematic way by knowingly marketing the business to thousands of California businesses through regular telemarketing calls to phone numbers with California area codes made on its behalf by Wholesale, by signing California businesses brought to it by Wholesale as clients together with Priority, and by regularly servicing those clients.

14.    This Court has personal jurisdiction over Priority Technology Holdings, Inc. and Priority Payment Systems, LLC because each operates its payment processing business in the state of California in a continuous and systematic way by knowingly marketing that business to thousands of California businesses through regular telemarketing calls to phone numbers with California area codes and in-person sales appointments made on its behalf by Wholesale, by signing California businesses brought to it by Wholesale as clients together with Wells Fargo, and by regularly servicing those clients.

15.    This Court has personal jurisdiction over The Credit Wholesale Company, Inc. because it operates its payment processing business in the state of California in a continuous and systematic way by knowingly marketing the business to thousands of California businesses through regular telemarketing calls to California area codes made on behalf of Wells Fargo and Priority, by signing California businesses as clients on behalf of Wells Fargo and Priority, and by regularly servicing those clients.

16.    Venue is proper in the Superior Court of the State of California, County of San Francisco under Cal. Code of Civ. Proc. § 395(a) because Wells Fargo has its principal place of business in this County. Venue is proper in the United States District Court for the Northern District of California under 28 U.S.C. 1441 because Defendant Wells Fargo removed this action to this district court from the Superior Court of the State of California, County of San Francisco.

## PARTIES

17.    Wells Fargo Bank, N.A. is a National Banking Association registered with the Comptroller of the Currency in Sioux Falls, South Dakota with its main branch at 101 N. Phillips

Ave., Sioux Falls, South Dakota. The headquarters, principal place of business, and "Corporate Offices" of Wells Fargo are located at 420 Montgomery Street, San Francisco, California.

18.    Priority Technology Holdings, Inc. is a Delaware Corporation with its headquarters and principal place of business at 2001 Westside Parkway, Unit 155, Alpharetta, Georgia.

19.    Priority Payment Systems, LLC is a Georgia limited liability corporation and the main subsidiary of Priority Technology Holdings, Inc. Its headquarters and principal place of business are also at 2001 Westside Parkway, Unit 155, Alpharetta, Georgia.

20.    The Credit Wholesale Company, Inc. is a Texas corporation with its headquarters and principal place of business at 7602 University Avenue, Lubbock, Texas.

21.    Central Coast Tobacco Company, LLC is a California Limited Liability Corporation that was a party to confidential communications that were surreptitiously recorded by Wholesale on behalf of Priority and Wells Fargo. These communications were received by Central Coast Tobacco Company, LLC doing business as Hellam's Tobacco and Wine Shop via a cordless telephone with an (831) California-only area code at its principal place of business at 423 Alvarado Street, Monterey, California. Wholesale could only reach that phone by dialing the phone number with the (831) California area code. Central Coast Tobacco Company, LLC did not initiate the call, had no prior relationship with Wholesale, had no knowledge that Wholesale was calling until the call was underway, and never received any disclosure—at any time—that recording was occurring, nor was there a beep or any other indicia of recording.

22.    Aguilar Auto Repair, Inc. is a California limited liability corporation that was a party to confidential communications that were surreptitiously recorded by Wholesale on behalf of Priority and Wells Fargo. These communications were received by Aguilar Auto Repair, Inc. via a cordless telephone with a (562) California area code at its principal place of business at 12262 1/2 Woodruff Avenue, Downey, California. Wholesale could only reach that phone by dialing the phone number with the (562) California area code. Aguilar Auto Repair, Inc. did not initiate the call, had no prior relationship with Wholesale, had no knowledge that Wholesale was calling until the call was

underway, and never received any disclosure—at any time—that recording was occurring, nor was there a beep or any other indicia of recording.

### THE CALIFORNIA INVASION OF PRIVACY ACT

23.     The California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630 *et seq*., was in effect at all times relevant to this complaint. Through CIPA, California is a so-called "two-party state" that requires the consent of all parties to a phone call before recording can occur. Section 632 of CIPA forbids the recordation of confidential communications that occur over any two telephones. *See* Cal. Penal Code § 632.

24.     "[A] conversation is confidential if a party to that conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded[.]" *Smith v. LoanMe*, 11 Cal. 5th 183, 193 (2021) (quoting *Flanagan v. Flanagan*, 27 Cal. 4th 766, 768 (2002).

25.     Section 632.7 of CIPA forbids the recordation of any communications—confidential or not—when those communications involve a cellular or cordless phone. *See* Cal. Penal Code § 632.7.

26.     CIPA provides for statutory damages of $5,000 per secretly recorded call. *See* Cal. Penal Code § 637.2.

27.     CIPA is a codification of long-held, common-sense beliefs about the right to speak candidly, free from intrusion.

28.     Defendants' practice of secretly recording phone calls to Plaintiffs injured Plaintiffs by violating their privacy.

### FACTUAL ALLEGATIONS

#### The payments processing industry in the United States

29.     Every business in the United States that wishes to accept payment by Visa or Mastercard must have a relationship with a bank that is a member of the Visa or Mastercard payment networks. In the lingo of the payments processing industry, these banks, which acquire businesses as clients, are called "acquirers" or "acquiring banks." The many thousands of retailers, restaurants, and other businesses that they acquire are called "merchants."

30.    Acquiring banks like Wells Fargo handle and process every credit and debit card transaction that occurs at its merchants' places of business. In return for these payment processing services, the acquirer charges its merchants a fee equal to a percentage of the dollar value of each transaction, plus other miscellaneous fees.

31.    The more merchants Wells Fargo acquires, the more transactions it processes, and the more money it makes from transaction fees. As a result, Wells Fargo has a strong incentive to acquire as many merchants as possible.

32.    Acquiring is a big business. According to a report authored by the Federal Reserve System, the total value of noncash payments in the United States in 2021 was $128.51 trillion. *See* Fed. Reserve System. *2022 Federal Reserve Payment Study: 2022 Triennial Initial Data Release*, www.federalreserve.gov/paymentsystenms/fr-payments/study.htm.

33.    Acquiring banks like Wells Fargo lack the staff to solicit the countless small merchants across the United States, much less provide them with the required equipment (credit card terminals, etc.) and ongoing customer service. So, Wells Fargo outsources this work to companies that specialize in sales and marketing. These sales and marketing companies are called either "Independent Sales Organizations ("ISOs")" or "Member Service Providers" ("MSPs"). The common abbreviation in the payments industry is ISO/MSP.

34.    Some ISO/MSPs are multi-billion-dollar corporations that provide sophisticated technological infrastructure and massive sales operations to acquirers. Others are small sales companies that focus only on telemarketing and in-person sales appointments to the mom-and-pop businesses that larger ISO/MSPs miss. Frequently, banks take a hands-off approach to managing their payments business and contract essentially all of their payments work to an ISO/MSP. These large companies—generally called a "processor"—then handle the technological infrastructure and sales work involved. These processors also supervise smaller ISO/MSPs that perform sales and marketing work that is targeted by region or business segment (*e.g.,* small and medium businesses).

35.    In this case, both Wholesale and Priority were ISO/MSPs of Wells Fargo. But Priority was a much larger "processor" that provided technological expertise to Wells Fargo in addition to doing its own sales and marketing for the bank.

36.    As part of its work for Wells Fargo, Priority managed and supervised the work of Wholesale, a smaller ISO/MSP that focused exclusively on sales and marketing to small merchants across the country.

37.    For its part, Wholesale was a mere "reseller" that was not even a party to the contracts that it offered to merchants. In fact, while Wholesale's logo appeared at the top of the payment processing contracts that it offered to merchants, it had no signature block at the bottom of those contracts. So, Wholesale was an agent in the classic sense: it had the power to identify sales targets and pursue them, but only on behalf of and for the benefit of Wells Fargo and Priority.

**The Wholesale Sales Program**

38.    Wholesale's primary function in the payments industry is to solicit merchants. Its sales program is simple and straightforward.

39.    Wholesale operates call centers around the country staffed with telemarketers. Every day, these telemarketers make appointment-setting phone calls to merchants targeting specific sales territories around the country, including in California. These are true "cold" calls, in that none of the call recipients, including Plaintiffs here, have any relationship with Wholesale at the time of the calls.

40.    The purpose of these telemarketing calls is to develop leads for Wholesale's team of field sales representatives. These field representatives are the individuals who present a contract to merchants and close the deal at the sales target's place of business.

41.    Wholesale's field sales representatives, as is typical in the industry, are paid on a commission basis. Because they are only paid when they close a sale, these sales representatives highly value good sales leads.

42.    Wholesale's call centers develop those sales leads. In every call, a Wholesale telemarketer offers the services of Wholesale, Priority, and Wells Fargo and attempts to schedule a

sales meeting between a Wholesale representative and a merchant. Call recipients, including

Plaintiffs, receive no notice or other forewarning before the call and so have no knowledge that they

will receive a telemarketing call from Wholesale until they answer the call, at which point the secret

recording is already underway.

43.    Because Wholesale knows when its sales representatives are scheduled to be in a

particular geographic area, Wholesale telemarketers make calls to target businesses in that

geographic area ahead of time. By making appointment-setting phone calls to the particular

geographic area in advance, Wholesale can ensure field sales representatives have an adequate

number of pre-scheduled sales appointments. In this case, Wholesale purposefully made secretly

recorded appointment-setting calls to small businesses in California with the intention of scheduling

in-person sales meetings at each target's place of business in California. When sales targets agreed to

a meeting, Wholesale sent a field sales representative to the California location of the small business

to try and close the deal. In this way, Wholesale purposefully targeted California businesses for

appointment-setting calls and availed itself of the privilege of doing business in California.

44.    For example, Wholesale called the (831) area code phone number associated with

Central Coast Tobacco, Inc. because Wholesale had scheduled a sales representative to work in the

area of Monterey, California where Central Coast Tobacco, Inc. is located. Similarly, Wholesale

called the (562) area code phone number associated with Aguilar Auto Repair, Inc. because

Wholesale had scheduled a sales representative to work in the area of Downey, California, where

Aguilar Auto Repair, Inc. is located. Wholesale carried out this identical process with many other

similarly situated California small businesses, calling their California area code phone numbers and

attempting to schedule sales meetings at the locations of their businesses in California.

45.    Both Wells Fargo and Priority knew Wholesale purposefully targeted California

businesses on behalf of Wells Fargo and Priority, because Wholesale regularly signed up California

small businesses as customers of Wells Fargo and Priority.

46.    Wholesale records all of its appointment-setting phone calls from beginning to end.

And those recordings are an essential part of Wholesale's sales model.

FIRST AMENDED CLASS ACTION COMPLAINT

47.     Managing and motivating telemarketers is not easy. The workers are unskilled, base pay is typically minimum wage, and turnover is high. Wholesale motivates its telemarketers by paying them a commission each time they successfully set a sales appointment. Fifty dollars per appointment is typical and it can add up. But this poses a problem: if telemarketers can claim a commission just for setting a sales appointment, they are incentivized to exaggerate or even falsely claim that a merchant agreed to an appointment. By recording all appointment-setting phone calls, Wholesale can audit a telemarketer's claim for a commission by simply listening to the call.

48.     Making sure each appointment is a genuine sales lead is also important to Wholesale's field sales representatives. Because Wholesale's field sales representatives are also paid on a commission basis, they highly value qualified sales leads. Plus, by reviewing appointment-setting calls, a sales representative can identify any particular services that were of interest during the call and tailor their pitch accordingly.

49.     In sum, recording appointment-setting calls is an essential part of Wholesale's overall sales model. Without those recordings, the sales model simply does not work.

50.     But nobody wants to be recorded by a telemarketer. If a telemarketer does warn a call recipient that an unsolicited telemarketing call is being recorded, the call recipient frequently ends the call.

51.     So, Wholesale had a solution: don't tell. Keep the fact that you are recording merchants a secret from them. Wholesale never disclosed to the recipients of appointment-setting phone calls that those calls were recorded. Nor did Wholesale provide any beep or other warning that could conceivably put call recipients on notice that the appointment-setting calls were being recorded. By definition, then, Wholesale never received consent—as required by CIPA—to record those calls.

52.     In fact, Wholesale call center employees followed standardized call scripts that they read out during each appointment-setting call. Those scripts never included any kind of warning or other disclosure that appointment-setting telemarketing calls were recorded.

53.     And it worked. In the twenty-first century, parties to a phone call have come to expect that they will receive a disclosure before they are recorded. Every telephone user is accustomed to some version of the standard disclosures—"This call may be recorded for quality assurance" or "I'm calling on a recorded line"—before recording takes place. Wholesale traded on that objective expectation and induced merchants to stay on a recorded call by denying them the disclosures they objectively expected to receive.

54.     Wholesale's sales program (i.e., appointment-setting telemarketing calls followed by in-person sales meetings) is by far the most common sales model used by ISO/MSPs operating in the payments processing industry. As a result, Priority and Wells Fargo were familiar with the use of secretly recorded appointment-setting calls as a sales tool and expected that it would occur.

55.     Wholesale had every expectation that Wells Fargo and Priority approved of its practice of recording appointment-setting phone calls because, as shown below, Wells Fargo and Priority each had the regulatory obligation and contractual power to review, inspect, and approve Wholesale's sales program. And both Wells Fargo and Priority did approve that sales program, including the call recording practices that were a key part of it.

56.     Further, Wholesale only ever signed merchants for Wells Fargo and Priority, not any other bank or processor. So, every appointment-setting telemarketing call was made on behalf of Wells Fargo and Priority in the hopes of bringing them more business. In other words, Wholesale secretly recorded phone calls to merchants because it furthered a sales and marketing plan that benefited both Wells Fargo and Priority.

57.     This conduct is a violation of CIPA.

## Regulating a troubled industry

58.     The payments industry has long been plagued by ISO/MSPs that engage in disreputable sales tactics and outright fraud. And the misconduct has featured the industry's most established players. In 2020, First Data Merchant Services, LLC, a payment processor and Fortune 500 company, agreed to pay $40.2 million in fines after the Federal Trade Commission accused it of "assisting and facilitating" money laundering. *See* Fed. Trade Comm'n, Press Release,

1  https://www.ftc.gov/news-events/news/press-releases/2020/05/worldwide-payment-processor-

2  payments-industry-executive-pay-402-million-settle-ftc-charges-assisting.

3      59.    In another case, an ISO/MSP was accused of "lur[ing] small businesses with false

4  promises" and "trapping" them with "hidden terms, surprise exit fees, and zombie charges." *See* Fed.

5  Trade Comm'n, Press Release, https://www.ftc.gov/news-events/news/press-releases/2022/07/ftc-

6  takes-action-stop-payment-processor-first-american-trapping-small-businesses-surprise-exit-fees.

7  Notably, the processor had targeted business owners with "limited English proficiency[.]" *See* Fed.

8  Trade Comm'n, Press Release, https://consumer.ftc.gov/consumer-alerts/2022/07/payment-

9  processors-sales-pitches-tricked-small-business-owners-0.

10     60.    ISO/MSPs are also notorious for contacting merchants and pretending to be the

11  merchant's existing acquirer before tricking them into signing "updated" contracts that turn out to be

12  whole new contracts with new acquirers. *See* Emma Fletcher, Fed. Trade Comm'n,

13  https://www.ftc.gov/business-guidance/blog/2018/06/credit-card-processing-deals-may-be-scams.

14     61.    Finally, the New York Attorney General recently concluded an enforcement action

15  against a finance company that, acting with ISO/MSPs, routinely trapped small business owners into

16  perpetual, non-cancelable leases of credit card terminals, pin pads, and similar equipment. *See* New

17  York Attorney General, Press Release, https://ag.ny.gov/press-release/2020/attorney-general-james-

18  wins-lawsuit-against-northern-leasing-systems-delivering. As a result of the scheme, small business

19  owners were tricked into to "paying thousands of dollars for equipment that costs only hundreds of

20  dollars[.]" *State of New York v. Northern Leasing Systems, Inc.*, 2020 NY Slip Op 20243 at 5 (May

21  29, 2020).

22     62.    Bad actors are attracted to the payments industry in part because starting an ISO/MSP

23  requires little capital: sales representatives are frequently paid 100% commission, so start-up costs

24  are low. Similarly, because acquiring banks only pay ISO/MSPs after a merchant has been

25  successfully recruited, banks have little downside to recruiting new ISO/MSPs.

26     63.    Public and private regulators have stepped in to fill the breach. Chiefly, Visa and

27  Mastercard regularly promulgate standards for the use of ISO/MSPs by acquiring banks. These

28

1  regulations are contained in the "Visa Core Rules and Product and Service Rules," the "Mastercard

2  Rules," and associated publications.

3      64.    The touchstone of the Visa and Mastercard Rules is that banks who use ISO/MSPs

4  must register them with Visa and Mastercard, control their work, and explicitly acknowledge them

5  as their legal agents in their contracts.

6                    **The Visa and Mastercard Rules governing ISO/MSPs**

7      65.    The Visa and Mastercard rules are mandatory, non-optional standards that "specify

8  the minimum requirements" for participation in the payment networks. *See, e.g.,* Visa Core Rules

9  and Visa Product and Service Rules at 59, available at https://usa.visa.com/support/consumer/visa-

10  rules.html; *see also* Mastercard Rules, available at

11  https://www.mastercard.us/content/dam/public/mastercardcom/na/global-site/documents/mastercard-

12  rules.pdf. Defendants openly acknowledge that they are subject to these Rules.

13      66.    Among other things, the Rules define the relationship between acquiring banks like

14  Wells Fargo and ISO/MSPs like Wholesale and Priority. Under the Rules, all parties know that the

15  relationship is specifically one of principal and agent.

16      67.    To begin, the Rules require that banks register any ISO/MSP with the Visa and

17  Mastercard networks as a "Third Party Agent." "A Member must register a Third Party Agent with

18  Visa." Visa Core Rule 1.10.8.6. For thirteen years, Wells Fargo has done just that, registering both

19  Wholesale and Priority as an "ISO-M" under the Visa global registry of service providers. *See*

20  Wholesale and Priority Visa Global Registry Validation Details, attached as Ex. A. As an ISO-M

21  (ISO-Merchant), Wholesale qualifies as a "Third Party Agent" in the Visa network. *See* Third Party

22  Agent Registration Program – TPA Types and Functional Descriptions at 1, attached as Ex. B

23  (providing that ISO-Ms are Third Party Agents).

24      68.    In fact, the Visa Rules literally define Third Party Agents as an "Agent" of the

25  registering bank. *See* Visa Core Rules and Visa Product Service Rules, glossary, at 838 (defining

26  "Agent" as "[a]n entity that acts as a VisaNet Processor/Visa Scheme Processor, or Third Party

27  Agent, or both.").

28

69.    The Mastercard Rules also define ISO/MSPs as agents of the bank they work for. "A Service Provider is an agent of the Customer [*i.e.,* bank] that receives or otherwise benefits from Program Service, whether directly or indirectly, performed by such Service Provider." Mastercard Rules, Appx. C., at 431; *see also id.* at 414 (defining "Independent Sales Organization ("ISO") as a "service provider").

70.    In sum, the Rules explicitly contemplate that the relationship between Wells Fargo on the one hand, and Priority and Wholesale on the other, is one of principal to agent.

71.    The Rules do not just define Wholesale and Priority as Wells Fargo's agents. They also give Wells Fargo the power to control their work.

72.    The Visa Rules provide that "[a]n Acquirer must implement, and its board of directors must approve … [a]n underwriting, monitoring, and control policy for [i]ts Third Party Agents." Visa Product and Service Rule 10.1.1.2. The board must also approve "[a] policy for reviewing solicitation materials used by its Agent." *Id.*

73.    Plus, "[b]efore registering a Third Party Agent, a Member must perform an on-site inspection of the Third Party Agent's business location as part of the due diligence requirement to … [r]eview solicitation or sales materials[.]" Visa Product and Service Rule 10.2.2.3.

74.    Once the principal-agent relationship is formed, banks like Wells Fargo are required to "perform an annual review of the Third Party Agent to confirm ongoing compliance with the applicable regional due diligence standards." *See* Visa Product and Service Rule 10.2.2.4.

75.    Beyond the annual rule, acquiring banks must be prepared to "submit a detailed quarterly report, signed by an authorized officer, of the activities and services of each Third Party Agent doing business on its behalf." *See* Visa Product and Service Rule 10.2.2.6.

76.    Visa's due diligence standards required Wells Fargo to "confirm that the agent is compliant with the Visa Rules, local, country and regional laws or regulations." *See* Visa Agent Due Diligence Risk Standards at 5, available at https://usa.visa.com/dam/VCOM/download/merchants/third-party-agent-due-diligence-risk-standards.pdf.

77.     The Mastercard Rules are just as direct. They require that "[t]he Customer [*i.e.,* acquiring bank] must at all times be *entirely responsible* for and *must manage, direct, and control all aspects* of the Customer's Program and Program Service performed by Service Providers[.]" Mastercard Rule 7.2.1 ("Customer Responsibility and Control") (emphasis added).

78.     In the same vein, an acquiring bank "must conduct meaningful monitoring of such Customer's [*e.g.,* acquirer's] Service Providers to ensure ongoing compliance by such Customer's Service Providers with the Standards." *See id.*

79.     "Before an entity commences to perform Program Service that supports or benefits a Customer's Program, the Customer must … [v]erify that the entity is operating a bona fide business … complies with applicable laws, and conduct appropriate due diligence to confirm such operations, safeguards, and compliance[.]" Mastercard Rule 7.2 ("The Program Service and Performance of Program Service").

80.     Finally, both the Visa and Mastercard Rules require acquiring banks to enter into contracts with their ISO/MSPs that set out a principal-agent relationship and that give the banks the power to monitor, inspect, and control their agents. *See, e.g.,* Visa Core Rule 1.10.8.5 ("Third Party Agent Contract"), Visa Product and Service Rule 10.2.2.2 ("Third Party Agent Contract Requirements"). Here, Wells Fargo did exactly that: its contracts with Priority and Wholesale acknowledge an actual agency relationship where Wells Fargo stands as the principal. What's more, as Wells Fargo's processor, Priority's contracts with Wholesale also acknowledge an actual agency relationship between Priority and Wholesale.

81.     In sum, under the Visa and Mastercard Rules, banks that put ISO/MSPs to work on their behalf do so with the explicit understanding that those ISO/MSPs are their legal agents and that they have the power to control their work. Indeed, they have the obligation to do so. And the power to control the work of another has always been the hallmark of an agency relationship. "An agency is proved by evidence that the person for whom the work was performed had the right to control the activities of the alleged agent." *Van't Rood v. County of Santa Clara*, 113 Cal. App. 4th 549, 572 (Cal. App. 2003). "It is not essential that the right of control be exercised or that there be actual

supervision of the work of the agent. The existence of the right of control and supervision establishes the existence of an agency relationship." *Malloy v. Fong*, 37 Cal. 2d 356, 370 (1951); *Castillo v. Glenair, Inc.*, 23 Cal. App. 5th 262, 278 (2018) (same).

82.    Wells Fargo exercised its power to control the work of Wholesale during the time that Wholesale was its registered agent.

83.    Wells Fargo exercised its power to control the work of Priority during the time that it was its registered agent.

**Wells Fargo's control over Wholesale and Priority**

84.    Wells Fargo fully complied with its obligation to "manage, direct, and control all aspects" of its payments business, including its utilization of Wholesale and Priority.

85.    To begin, Wells Fargo duly registered Wholesale and Priority as its agents in the Visa and Mastercard networks. *See* Wholesale and Priority Visa Global Registry Validation Details, attached as Ex. A.

86.    Under the Rules, Wells Fargo explicitly contemplated that it was entering into a principal-agent relationship with Wholesale and Priority for the purpose of marketing the bank's payments business.

87.    Before accepting Wholesale as its agent, Wells Fargo also conducted a due diligence review of Wholesale that required, among other things, Wholesale to describe its sales model in detail, specifically including its lead generation model (*i.e.,* Wholesale's use of appointment-setting telemarketing calls). Wells Fargo did the same for Priority.

88.    Wells Fargo personnel also conducted on-site inspections of Wholesale and Priority workplaces, during which their sales and marketing procedures and practices were inspected and approved.

89.    Wells Fargo further reviewed and approved all solicitation materials utilized by Wholesale and Priority, including the scripts and any other materials utilized by Wholesale telemarketers when they made their appointment-setting telephone calls.

90.     Beyond its initial due diligence, Wells Fargo also conducted ongoing reviews of Wholesale and Priority's sales and marketing work, authorizing both agents to continue their work on behalf of Wells Fargo.

91.     By exercising its powers under the Rules and its contract, Wells Fargo showed it had the undeniable power to control the work of Wholesale and Priority. And this was no accident. Wells Fargo explicitly contemplated that Wholesale and Priority were its agents. In fact, under the Visa and Mastercard Rules, neither Wholesale nor Priority could do any sales work *at all* in the payments processing industry without the authorization of their registering bank Wells Fargo. *See* Mastercard Rule 7.1 ("Before an entity commences Program Service…").

92.     Plus, because the recording of appointment-setting phone calls was so central to Wholesale's business model, Wells Fargo could not have failed to discover its practice of recording those calls without warning had Wells Fargo exercised its supervisory duties under the Visa and Mastercard Rules.

93.     But if Wells Fargo did fail to exercise the supervisory duties called for by the Visa and Mastercard Rules, that does not limit the bank's liability for its agent's acts. Under California law, "[a]ctual authority is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess." Cal. Civ. Code § 2316. Simply put, California law does not excuse a principal from liability when a principal fails to exercise its right to control the work of an agent. "It is not essential that the right of control be exercised or that there be actual supervision of the work of the agent. The existence of the right of control and supervision establishes the existence of an agency relationship." *Malloy v. Fong*, 37 Cal. 2d at 370.

94.     Accordingly, even if Wells Fargo flouted the Visa and Mastercard Rules and failed to conduct the inspections and reviews they required—but allowed Wholesale and Priority to continue working anyway—that would have sent a clear message to Wholesale and Priority that the Rules could be broken and they could do whatever they wanted as long as it produced revenue. In such an

1   instance, under California law, Wholesale was working with actual authority as an agent of Wells

2   Fargo.

3       95.     Wells Fargo also subjectively intended that both Priority entities would work as its

4   agent. First, Wells Fargo explicitly registered Priority Technology Holdings, LLC as its agent in the

5   Visa Global Registry of Service Providers. *See* Wholesale and Priority Visa Global Registry

6   Validation Details, attached as Ex. A.

7       96.     Beyond registering Priority Technology Holdings, Inc., as its agent, Wells Fargo also

8   knew that entity—explicitly named as a holding company—owned and controlled its subsidiary,

9   Priority Payment Systems, LLC. In fact, the contract that businesses signed with Wholesale makes

10  Priority Payment Systems, LLC a party to the contract on a signature blank that is directly adjacent

11  to the signature blank for Wells Fargo Bank, NA. *See* Merchant Processing Application and

12  Agreement, Ex. C. So, every time Wells Fargo signed a contract with a California small business

13  that was brought to it by Wholesale, it literally signed alongside Priority Payment Systems, LLC.

14  Thus, it was no surprise to Wells Fargo that both its registered agent Priority Technology Holdings,

15  Inc. and the subsidiary Priority Payment Systems, LLC were busy working as agents of the bank to

16  make new payment processing sales from small businesses located in California.

17      97.     Finally, Wholesale was only ever an agent of Wells Fargo—not any other bank.

18  Indeed, as required by the Rules, Wholesale discloses on its website that it is "a registered

19  Independent Sales Organization of Wells Fargo Bank, N.A., Concord, CA." *See* Visa Product and

20  Service Rule 10.2.2.9 (requiring that "the Third Party Agent is prominently identified as a

21  representative of the Member."). No other bank is listed. Accordingly, all of Wholesale's

22  appointment-setting phone calls were made with the goal of selling the payment processing services

23  of Wells Fargo. Similarly, Priority holds out to the public that it is "a registered ISO of Wells Fargo

24  Bank, N.A." on its website and on its merchant applications. *See* Merchant Processing Application

25  and Agreement, attached as Ex. C.

26

27

28

**Priority's control over Wholesale**

98.     As stated above, it is not uncommon for an acquiring bank to hire a large ISO/MSP "processor" to manage its overall payments business, including the supervision of smaller ISO/MSPs.

99.     In this case, Priority was one of the larger ISO/MSP that Wells Fargo relied on to manage its payments business. In fact, Priority holds itself out as the sixth largest "non-bank merchant acquirer [*i.e.,* processor] in the United States."

100.     And, indeed, Wells Fargo has delegated to Priority the work of managing significant parts of the bank's payments business, specifically including the oversight and supervision of Wholesale in compliance with the Rules.

101.     For example, in Form 10-K reports made to the Securities and Exchange Commission, Priority declares that "[c]entral to our risk management process are our front-line underwriting policies that vet all resellers [*i.e.,* ISO/MSPs] and merchants prior to their contractual arrangements with us. … The collected information is delivered to a tenured team of underwriters who conduct any necessary industry checks[.]" These "industry checks" are, of course, the ones called for by the Rules.

102.     Indeed, in its SEC Form 10-K, Priority states that its ISO/MSPs "are subject to quarterly and/or annual assessments for financial strength in compliance with our policies[.]" These annual and quarterly reviews mirror the "annual report" and "detailed quarterly reports" required by Visa Product and Service Rules 10.2.2.4 and 10.2.2.6. In this way, Priority steps into Wells Fargo's shoes in the principal-agent relationship with Wholesale and supervises and controls Wholesale's sales activities.

103.     Specifically, as its "processor," Wells Fargo relied on Priority to carry out the ongoing site visits, document reviews, and other supervisory work called for by the Visa and Mastercard Rules. Frequently, it was Priority account executives and other managers who visited Wholesale facilities, audited their sales activities, and reviewed and approved Wholesale's sales program on behalf of Wells Fargo.

104.    In fact, Priority also contracted with Wholesale and engaged Wholesale as an agent in accordance with the Visa and Mastercard Rules. That contract similarly gave Priority the power to audit and control the sales work of Wholesale in the same way as Wells Fargo. Because Priority knowingly accepted the contractual power to control Wholesale's sales work—and could stop sales altogether if it withheld approval—Priority is responsible for Wholesale's as a principal to an agent.

105.    And, even if Priority did not responsibly exercise its power to control Wholesale, that does not limit the processor's liability for its agent's acts. Under California law, "[a]ctual authority is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess." Cal. Civ. Code § 2316. Simply put, California law does not excuse a principal from liability when a principal fails to exercise its right to control the work of an agent. "It is not essential that the right of control be exercised or that there be actual supervision of the work of the agent. The existence of the right of control and supervision establishes the existence of an agency relationship." *Malloy v. Fong*, 37 Cal. 2d at 370.

106.    Accordingly, even if Priority failed to conduct the inspections and reviews they required by the Visa and Mastercard Rules—but allowed Wholesale and Priority to continue working anyway—that would have sent a clear message to Wholesale and Priority that the Rules could be broken and they could do whatever they wanted as long as it produced revenue. In such an instance, under California law, Wholesale was working with actual authority as an agent of Wells Fargo.

107.    Priority also makes it clear in its SEC filings that "[m]ost of the Company's merchant customers were referred to the Company by an ISO or other reseller partners." In other words, Priority does very little sales work of its own, but instead relies on ISOs like Wholesale. That means giving Wholesale the authority to enter into contracts between merchants, on one hand, and Priority, on the other, was a central part of Priority's business model.

108.    Because Priority had the power to control the work of Wholesale while acting on behalf of Wells Fargo and because Priority separately authorized Wholesale to solicit merchants and

1  enter into contracts between merchants and Priority, Priority is responsible for Wholesale's illegal

2  conduct.

3  **Plaintiffs' Discovery of the Secret Recordings**

4       109.    Plaintiffs learned from their counsel that they were secretly recorded by Defendants.

5  Specifically, Aguilar Auto Repair, Inc. learned it had been secretly recorded during a communication

6  between its owner Francisco Aguilar and its counsel on February 24, 2023. Similarly, Central Coast

7  Tobacco, Inc. learned it has been secretly recorded during a communication between its owner

8  Wyatt Miller and its counsel on November 10, 2022. Before that time, Plaintiffs could not have

9  reasonably discovered that phone calls they received from Defendants were secretly recorded. That

10  is because Defendants never disclosed the fact that they recorded their appointment-setting

11  telemarketing cold calls nor was there any beep or other indicia of recording. On the contrary, they

12  intentionally concealed the practice. Plaintiffs filed suit in the Superior Court of the State of

13  California on October 10, 2023.

14  **CLASS ALLEGATIONS**

15       110.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil

16  Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3), California Code of Civil Procedure § 382,

17  California Civil Code § 1781, and all other applicable laws and rules, both individually and on

18  behalf of two classes of persons defined as follows:

19  **The § 632 Class**

20  All businesses who received an appointment-setting telephone call from

21  Wholesale on a telephone in California during the time that Wholesale was a

22  registered agent of Wells Fargo.

23  **The § 632.7 Class**

24  All businesses who received an appointment-setting telephone call from

25  Wholesale on a cordless or cellular phone in California during the time that

26  Wholesale was a registered agent of Wells Fargo.

27

28

111.    Defendants and their officers, directors, and employees, plus any judge who may preside over this case and that judge's family are excluded from the Classes.

112.    The Classes include tens of thousands of businesses who received appointment-setting telemarketing calls from Wholesale's call centers. The members of the Classes are so numerous that joinder of all members is impracticable. The exact number of class members is unknown at this time but can be determined through Defendants' records.

113.    Plaintiffs' claims are typical of the claims of the class members because each of them simply received appointment-setting phone calls that were secretly recorded without any disclosure at any time.

114.    Plaintiffs will fairly and adequately represent the interests of the class members. Plaintiffs' interests do not conflict with any members of the Classes they seek to represent and intend on prosecuting this action vigorously. To that end, Plaintiffs have retained competent counsel with experience in complex class action litigation, as well as litigation under CIPA, to represent the classes.

115.    There is a community of interest among members of the Classes, because there are common questions of fact and law that predominate over any individual issues for the Classes. These common questions include:

a.    Whether Plaintiffs and class members consented to the recordation of confidential communications between themselves and Wholesale under CIPA § 632 and 632.7.

b.    Whether, under CIPA § 632, Plaintiffs and class members had a reasonable expectation that Wholesale was not recording the appointment-setting telemarketing calls.

c.    Whether Wells Fargo is vicariously liable for the secret recordings of appointment-setting telephone calls made by Wholesale.

d.    Whether Priority is vicariously liable for the secret recordings of appointment-setting telephone calls made by Wholesale.

116.    A class action is superior to any other means for the fair and efficient adjudication of this controversy. The damages suffered by Plaintiffs and class members are relatively small

compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for class members to individually seek redress for Defendants' illegal conduct. To do so would require tens of thousands of individual cases, consuming judicial resources, and potentially resulting in inconsistent or contradictory judgments. By contrast, class treatment promises the conclusion of all claims in one manageable proceeding. Certification is therefore appropriate under California Code of Civil Procedure § 382.

## CLAIMS OF THE CIPA § 632 CLASS

**COUNT I**
*Against*
**WELLS FARGO BANK, N.A.**
**Violation of Cal. Penal Code § 632**

117.    Plaintiffs incorporate all prior paragraphs as if fully alleged herein.

118.    Wholesale's conduct constitutes a violation of California Penal Code § 632 because Wholesale recorded telephone communications with Plaintiffs without Plaintiffs' consent and without disclosure such that Plaintiffs did not reasonably expect that Wholesale would record the communications.

119.    Plaintiffs and class members have suffered an injury to their privacy as a proximate result of Wholesale's violation of California Penal Code § 632.

120.    Wells Fargo granted Wholesale the authority to act as its agent and solicit merchants on its behalf.

121.    Wholesale did solicit Plaintiffs and class members on behalf of Wells Fargo as described in this complaint.

122.    Every time Wholesale secretly recorded an appointment-setting phone call made to Plaintiffs and class members, that phone call was placed and recorded as part of a sales strategy devised for the benefit of Wells Fargo.

123.    Wells Fargo had the power and obligation to direct and control Wholesale's sales and marketing activities, including its appointment-setting telemarketing work.

1    124.    Wells Fargo fully complied with its obligations under the Rules and did indeed

2    supervise and control the sales and marketing work performed by Wholesale.

3    125.    Wholesale further held itself out to Plaintiffs, class members, and the public at large

4    as a registered agent of Wells Fargo and did so with Wells Fargo's full knowledge and approval.

5    126.    Accordingly, Wholesale acted as an agent of Wells Fargo when it secretly recorded

6    appointment-setting telemarketing calls to Plaintiff and class members. Wholesale was acting within

7    the scope of that relationship when it secretly recorded those calls. Therefore, Wells Fargo is

8    responsible for Wholesale's violations of CIPA.

9    127.    California Penal Code § 637.2 grants Plaintiffs and class members the power to bring

10    a private action to remedy a violation of California Penal Code § 632 and fixes the amount of

11    damages recoverable at $5,000 per violation. Plaintiffs are entitled to such damages, along with pre-

12    and post-judgment interest.

13    128.    California Penal Code § 637.2 further entitles Plaintiffs to enjoin and restrain any

14    further violation of California Penal Code § 630 *et seq*.

15    129.    Plaintiffs' contact information is plainly in the possession of Wholesale and, as such,

16    they are at risk of receiving additional secretly recorded appointment-setting calls from Wholesale.

17    Plaintiffs and class members are entitled to relief and part of said relief demands that Wells Fargo be

18    perpetually restrained from continued violations of California Penal Code § 632 through the acts of

19    its agent Wholesale.

20

21                                    **COUNT II**
                                      ***Against***
22                  **PRIORITY TECHNOLOGY HOLDINGS, INC. and**
                      **PRIORITY PAYMENT SYSTEMS, LLC**
23                  <u>**Violation of Cal. Penal Code § 632**</u>

24    130.    Plaintiffs incorporate all prior paragraphs as if fully alleged herein.

25    131.    Wholesale's conduct constitutes a violation of California Penal Code § 632 because

26    Wholesale recorded telephone communications with Plaintiffs without Plaintiffs' consent and

27

28

1  without disclosure such that Plaintiffs did not reasonably expect that Wholesale would record the

2  communications.

3      132.   Plaintiffs and class members have suffered an injury to their privacy as a proximate

4  result of Wholesale's violation of California Penal Code § 632.

5      133.   Priority granted Wholesale the authority to act as its agent and solicit merchants on its

6  behalf.

7      134.   Wholesale did solicit Plaintiffs and class members on behalf of Priority as described

8  in this complaint.

9      135.   Every time Wholesale secretly recorded an appointment-setting phone call made to

10  Plaintiffs and class members, that phone call was placed and recorded as part of a sales strategy

11  devised for the benefit of Priority.

12      136.   Priority had the power and obligation to direct and control Wholesale's sales and

13  marketing activities, including its appointment-setting telemarketing work.

14      137.   Priority did indeed supervise and control the sales and marketing work performed by

15  Wholesale.

16      138.   Accordingly, Wholesale acted as an agent of Priority when it secretly recorded

17  appointment-setting telemarketing calls to Plaintiff and class members. Wholesale was acting within

18  the scope of that relationship when it secretly recorded those calls. Therefore, Priority is responsible

19  for Wholesale's violations of CIPA.

20      139.   California Penal Code § 637.2 grants Plaintiffs and class members the power to bring

21  a private action to remedy a violation of California Penal Code § 632 and fixes the amount of

22  damages recoverable at $5,000 per violation. Plaintiffs are entitled to such damages, along with pre-

23  and post-judgment interest.

24      140.   California Penal Code § 637.2 further entitles Plaintiffs to enjoin and restrain any

25  further violation of California Penal Code § 630 *et seq*.

26      141.   Plaintiffs' contact information is plainly in the possession of Wholesale and, as such,

27  they are at risk of receiving additional secretly recorded appointment-setting calls from Wholesale.

28

142.    Plaintiffs and class members are entitled to relief and part of said relief demands that Priority be perpetually restrained from continued violations of California Penal Code § 632 through the acts of its agent Wholesale.

**COUNT III**
***Against***
**THE CREDIT WHOLESALE COMPANY, INC.**
**Violation of Cal. Penal Code § 632.**

143.    Plaintiffs incorporate all prior paragraphs as if fully alleged herein.

144.    Wholesale's conduct constitutes a violation of California Penal Code § 632 because Wholesale recorded telephone communications with Plaintiffs without Plaintiffs' consent and without disclosure such that Plaintiffs did not reasonably expect that Wholesale would record the communications.

145.    Plaintiffs and class members have suffered an injury to their privacy as a proximate result of Wholesale's violation of California Penal Code § 632.

146.    California Penal Code § 637.2 grants Plaintiffs and class members the power to bring a private action to remedy a violation of California Penal Code § 632 and fixes the amount of damages recoverable at $5,000 per violation. Plaintiffs are entitled to such damages, along with pre- and post-judgment interest.

147.    California Penal Code § 637.2 further entitles Plaintiffs to enjoin and restrain any further violation of California Penal Code § 630 *et seq*.

148.    Plaintiffs' contact information is plainly in the possession of Wholesale and, as such, they are at risk of receiving additional secretly recorded appointment-setting calls from Wholesale. Plaintiffs and class members are entitled to relief and part of said relief demands that Wholesale be perpetually restrained from continued violations of California Penal Code § 632.

## CLAIMS OF THE CIPA § 632.7 CLASS

**Count IV**
*Against*
**WELLS FARGO BANK, N.A.**
**Violation of Cal. Penal Code § 632.7**

149.    Plaintiffs incorporate all prior paragraphs as if fully alleged herein.

150.    Wholesale's conduct constitutes a violation of California Penal Code § 632.7 because Wholesale recorded communications occurring over a cordless or cellular telephone without Plaintiffs' consent.

151.    Plaintiffs and class members have suffered an injury to their privacy as a proximate result of Wholesale's violation of California Penal Code § 632.7.

152.    Wells Fargo granted Wholesale the authority to act as its agent and solicit merchants on its behalf.

153.    Wholesale did solicit Plaintiffs and class members on behalf of Wells Fargo as described in this complaint.

154.    Every time Wholesale secretly recorded an appointment-setting phone call made to Plaintiffs and class members, that phone call was placed and recorded as part of a sales strategy devised for the benefit of Wells Fargo.

155.    Wells Fargo had the power and obligation to direct and control Wholesale's sales and marketing activities, including its appointment-setting telemarketing work.

156.    Wells Fargo fully complied with its obligations under the Rules and did indeed supervise and control the sales and marketing work performed by Wholesale.

157.    Wholesale further held itself out to Plaintiffs, class members, and the public at large as a registered agent of Wells Fargo and did so with Wells Fargo's full knowledge and approval.

158.    Accordingly, Wholesale acted as an agent of Wells Fargo when it secretly recorded appointment-setting telemarketing calls to Plaintiff and class members. Wholesale was acting within the scope of that relationship when it secretly recorded those calls. Therefore, Wells Fargo is responsible for Wholesale's violations of CIPA.

159. California Penal Code § 637.2 grants Plaintiffs and class members the power to bring a private action to remedy a violation of California Penal Code § 632.7 and fixes the amount of damages recoverable at $5,000 per violation. Plaintiffs are entitled to such damages, along with pre- and post-judgment interest.

160. California Penal Code § 637.2 further entitles Plaintiffs to enjoin and restrain any further violation of California Penal Code § 630 *et seq*.

161. Plaintiffs' contact information is plainly in the possession of Wholesale and, as such, they are at risk of receiving additional secretly recorded appointment-setting calls from Wholesale.

162. Plaintiffs and class members are entitled to relief and part of said relief demands that Wells Fargo be perpetually restrained from continued violations of California Penal Code § 632.7 through the acts of its agent Wholesale.

**Count V**
*Against*
**PRIORITY TECHNOLOGY HOLDINGS, INC. and
PRIORITY PAYMENT SYSTEMS, LLC
Violation of Cal. Penal Code § 632.7**

163. Plaintiffs incorporate all prior paragraphs as if fully alleged herein.

164. Wholesale's conduct constitutes a violation of California Penal Code § 632.7 because Wholesale recorded communications occurring over a cordless or cellular telephone without Plaintiffs' consent.

165. Plaintiffs and class members have suffered an injury to their privacy as a proximate result of Wholesale's violation of California Penal Code § 632.7.

166. Priority granted Wholesale the authority to act as its agent and solicit merchants on its behalf. Wholesale did solicit Plaintiffs and class members on behalf of Priority as described in this complaint.

167. Every time Wholesale secretly recorded an appointment-setting phone call made to Plaintiffs and class members, that phone call was placed and recorded as part of a sales strategy devised for the benefit of Priority.

168.    Priority had the power and obligation to direct and control Wholesale's sales and marketing activities, including its appointment-setting telemarketing work.

169.    Priority did indeed supervise and control the sales and marketing work performed by Wholesale.

170.    Accordingly, Wholesale acted as an agent of Priority when it secretly recorded appointment-setting telemarketing calls to Plaintiff and class members. Wholesale was acting within the scope of that relationship when it secretly recorded those calls. Therefore, Priority is responsible for Wholesale's violations of CIPA.

171.    California Penal Code § 637.2 grants Plaintiffs and class members the power to bring a private action to remedy a violation of California Penal Code § 632.7 and fixes the amount of damages recoverable at $5,000 per violation. Plaintiffs are entitled to such damages, along with pre- and post-judgment interest.

172.    California Penal Code § 637.2 further entitles Plaintiffs to enjoin and restrain any further violation of California Penal Code § 630 *et seq*.

173.    Plaintiffs' contact information is plainly in the possession of Wholesale and, as such, they are at risk of receiving additional secretly recorded appointment-setting calls from Wholesale. Plaintiffs and class members are entitled to relief and part of said relief demands that Priority be perpetually restrained from continued violations of California Penal Code § 632.7 through the acts of its agent Wholesale.

**Count VI**
***Against***
**THE CREDIT WHOLESALE COMPANY, INC.**
**Violation of Cal. Penal Code § 632.7**

174.    Plaintiffs incorporate all prior paragraphs as if fully alleged herein.

175.    Wholesale's conduct constitutes a violation of California Penal Code § 632.7 because Wholesale recorded communications occurring over a cordless or cellular telephone without Plaintiffs' consent.

1    176.    Plaintiffs and class members have suffered an injury to their privacy as a proximate

2  result of Wholesale's violation of California Penal Code § 632.7.

3    177.    California Penal Code § 637.2 grants Plaintiffs and class members the power to bring

4  a private action to remedy a violation of California Penal Code § 632.7 and fixes the amount of

5  damages recoverable at $5,000 per violation. Plaintiffs are entitled to such damages, along with pre-

6  and post-judgment interest.

7    178.    California Penal Code § 637.2 further entitles Plaintiffs to enjoin and restrain any

8  further violation of California Penal Code § 630 *et seq*.

9    179.    Plaintiffs' contact information is plainly in the possession of Wholesale and, as such,

10  they are at risk of receiving additional secretly recorded appointment-setting calls from Wholesale.

11  Plaintiffs and class members are entitled to relief and part of said relief demands that Wholesale be

12  perpetually restrained from continued violations of California Penal Code § 632.7.

13  **REQUEST FOR RELIEF**

14    WHEREFORE, Plaintiffs, individually and on behalf of the Classes, requests that this Court

15  enter judgment in their favor and against Defendants as follows:

16    a.    Enter an Order certifying this as a class action and designating Plaintiffs as

17    representatives of the Classes and Plaintiffs' counsel as Class Counsel;

18    b.    Grant permanent injunctive relief enjoining Defendants from the non-consensual

19    recordation of telephonic communications in violation of Cal. Penal Code §632 or § 632.7;

20    c.    Award monetary relief to Plaintiffs and the Classes in the amount of $5,000 per

21    violation of CIPA §§ 632 and 632.7;

22    d.    Award pre-and post-judgment interest;

23    e.    Award reasonable attorneys' fees and costs to Plaintiffs' counsel;

24    f.    Grant such further and other relief as this Court deems appropriate.

25  **JURY DEMAND**

26    Plaintiffs and the Classes demand a trial by jury on all issues that may be tried and decided

27  by a jury.

28

1

Dated:  February 16, 2024                    Respectfully submitted,

2

3                                            */s/ Jennie Lee Anderson*
                                             Jennie Lee Anderson (SBN 203586)
4                                            Lori E. Andrus (SBN 205816)
                                             **ANDRUS ANDERSON LLP**
5                                            155 Montgomery Street, Suite 900
                                             San Francisco, California  94104
6                                            Tel:  415-986-1400
                                             jennie@andrusanderson.com
7                                            lori@andrusanderson.com

8                                            Myron M. Cherry (SBN 50278)
                                             Jacie C. Zolna (*pro hac vice*)
9                                            Benjamin R. Swetland (*pro hac vice*)
                                             **MYRON M. CHERRY & ASSOC., LLC**
10                                           30 North LaSalle Street, Suite 2300
                                             Chicago, Illinois  60602
11                                           Tel:  312-372-2100
                                             mcherry@cherry-law.com
12                                           jzolna@cherry-law.com
                                             bswetland@cherry-law.com

13                                           ***Counsel for Plaintiffs and the Proposed***
                                             ***Classes***
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT