# Ex. A

Jennie Lee Anderson (SBN 203586)
**ANDRUS ANDERSON LLP**
155 Montgomery Street, Suite 900
San Francisco, California 94104
Tel:  415-986-1400
jennie@andrusanderson.com

Myron M. Cherry (SBN 50278)
Jacie C. Zolna (*pro hac vice*)
Benjamin R. Swetland (*pro hac vice*)
**MYRON M. CHERRY & ASSOC., LLC**
30 North LaSalle Street, Suite 2300
Chicago, Illinois 60602
Tel:  312-372-2100
mcherry@cherry-law.com
jzolna@cherry-law.com
bswetland@cherry-law.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| AGUILAR AUTO REPAIR, INC. and CENTRAL COAST TOBACCO CO., LLC, individually and on behalf all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>WELLS FARGO BANK, N.A., PRIORITY TECHNOLOGY HOLDINGS, INC., PRIORITY PAYMENT SYSTEMS, LLC and THE CREDIT WHOLESALE COMPANY, INC.,<br><br>        Defendants. | Case No. 3:23-cv-06265-AMO<br><br>**DECLARATION OF JACIE C. ZOLNA IN SUPPORT OF PLAINTIFFS' MOTION FOR CERTIFICATION OF SETTLEMENT CLASS AND PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** |

I, Jacie C. Zolna, declare as follows:

1.      I am a partner at Myron M. Cherry & Associates, LLC (the "Firm") and represent Plaintiffs in *Aguilar Auto Repair, Inc., et al. v. Wells Fargo Bank, N.A., et al.*, Case No. 3:23-cv-06265 pending in the United States District Court for the Northern District of California (the "Lawsuit"). I have personal knowledge of the facts set forth in this declaration and, if called to testify, could and would testify competently thereto.

2.      I have been practicing law since 2002. I received my J.D. from DePaul University College of Law where I graduated with honors and was a member of the DePaul Law Review. I am admitted to the Illinois Bar, the Minnesota Bar, the United States District Court for the Northern District of Illinois, and the Seventh Circuit Court of Appeals. I have successfully argued cases before both the Illinois Appellate Court and the Seventh Circuit Court of Appeals. On two occasions, in 2013 and 2017, I was presented the Award for Excellence in *Pro Bono* Service by the United States District Court for the Northern District of Illinois for outstanding *pro bono* and public interest representation.

3.      I and others in the Firm have wide experience in class actions and complex litigation. The Firm has represented plaintiffs and defendants in a variety of substantive litigation including, without limitation, class actions, civil rights, contract, privacy, antitrust, fraud, securities actions, environmental, and tort cases.

4.      For the past several years, the Firm has been investigating privacy violations by Independent Sales Organizations ("ISOs") in the payment processing industry, including practices that violate the California Invasion of Privacy Act ("CIPA"). A major hurdle to bringing a CIPA suit against an ISO, however, is that ISOs are generally smaller telemarketing companies against whom it would be difficult to recover any judgment or even a modest settlement. After studying the payment industry and the Visa and Mastercard rules that govern that industry, the Firm developed a legal theory that would hold the larger banks and processors vicariously liable for the acts of their ISO. This legal theory was based on, among other things, the Visa and Mastercard rules. To the Firm's knowledge, no lawsuit had ever been brought to remedy CIPA violations

using this legal theory.

5.      As a result of this research and investigation, the Firm brought a class action lawsuit against, among others, Wells Fargo, one of its processor, and one of its ISOs on behalf of California businesses whose phone conversations were recorded without consent in violation of CIPA. *See C.S. Wang v. Wells Fargo Bank*, N.A., 16-cv-11223 (N.D. Ill.). Wells Fargo and the other defendants moved for sanctions against plaintiffs and our Firm asserting that the suit was frivolous. That motion was denied, as were numerous motions to dismiss, and the Firm proceeded to prosecute the suit for six years. After class certification was fully briefed and awaiting a ruling, the suit settled for a total of $78,000,000, which represents the largest settlement ever in a CIPA class action. The *Wang* settlement included 500,790 class members who collectively received 1,603,445 calls.

6.      The Firm's concern about bringing suit solely against an ISO for these CIPA violations proved correct in the *Wang* case. The ISO in that case declared bankruptcy during the litigation, which resulted in the ISO being dismissed from the case entirely.

7.      The Firm has been substantively involved in several other class actions and complex matters. For example, I and others in the Firm were appointed class counsel in *McKenzie-Lopez et al. v. City of Chicago*, No. 15 CH 4802 (Circuit Court of Cook County, Illinois) (challenging the manner in which the City of Chicago operated and enforced its speed and red light camera program, which resulted in settlement valued at over $125 Million); *Midwest Medical Records Association, Inc. v. Brown*, No. 15 CH 16986 (Circuit Court of Cook County, Illinois) (class action seeking the return of unlawful filing fees collected by the Cook County Clerk of Court, which resulted in a settlement that provided full refunds to class members, as well as injunctive relief preventing the Clerk from charging the fee in the future); *Ehret v. Uber Technologies, Inc.*, No. 3:14-cv-113-EMC (N.D. Cal.) (consumer fraud action based on misrepresentations regarding gratuity charge, which resulted in settlement that provided full refunds to consumers); and *Otero v. Dart, et al.*, No. 12-cv-3148 (N.D. Ill.) (challenge to the

DECLARATION OF JACIE C. ZOLNA ISO PLAINTIFFS'          CASE NO. 3:23-cv-06265-AMO
MOTION FOR CLASS CERT. AND PREL. APPROVAL

Sherriff of Cook County's release procedures for individuals acquitted of wrongdoing at trial, which resulted in a settlement that required changes to the Sheriff's release procedures, as well as monetary payments to individual class members).

8.      Over the years, our Firm has recovered hundreds of millions of dollars in verdicts and settlements for the classes, individuals, and entities whom we have represented. A summary of representative cases is attached hereto as **Ex. 1**.

9.      The Firm also devotes a significant amount of time to public interest issues, including community affairs, political affairs, *pro bono* representation, and assisting indigent individuals.

10.     The parties retained Verita Global to administer the settlement. Verita Global analyzed call records and other data to determine membership in the class. Based on that analysis, Verita Global determined that there were approximately 92,668  potential class members who received approximately 149,010 calls during the relevant time period. According to a survey of the calls conducted by Wholesale's counsel, the average length of the calls at issue were approximately 45 seconds, with many lasting less than 15 seconds.

11.     Based on my decades of experience in complex and class action litigation, I believe the proposed settlement of the Lawsuit is more than fair, reasonable, and adequate. The $19,500,000 settlement fund will provide significant relief to the class and reasonably accounts for the risks and costs associated with continued litigation and the uncertainties of a trial and any appeals. Based on our Firm's research, the largest settlement of a CIPA class action prior to this Lawsuit and our Firm's recent settlement of the *Wang* case referenced above was $18,000,000 for a class of approximately 4,000,000 members (**$4.50 per class member**). *See Marenco v. Visa, Inc.,* C.D. Cal. Case No. 2:10-cv-08022.

12.     The per class member settlement amount here is **$210.43 per class member** ($19,500,000 / 92,668 class members) and $130.86 per call ($19,500,000 / 149,010 calls). Based on an estimated claims rate of 8%-12%, it is anticipated that class members will receive an

average settlement payment of approximately **$1,164.57—$1,746.93 each** even after payment of the requested attorneys' fees and costs and incentive awards.[1]

13.    Based on the Firm's research, most CIPA class actions settle for less than $10,000,000. The CIPA class action settlements we found that exceeded $10,000,000—with information on the total settlement fund, class members and calls involved, the per class member and per call recovery, and attorneys' fees and costs awarded—are contained in the chart attached as Ex. 2. Other information on these settlements as provided for in this District's Procedural Guidance for Class Action Settlements is contained in the chart attached as Ex. 3. *See also In re Vizio, Inc., Consumer Priv. Litig.*, No. 816ML02693JLSKES, 2019 WL 12966638 (C.D. Cal. July 31, 2019) ($17,000,000 settlement on behalf of approximately 16,000,000 class members (**$1.06 per class member**) that brought claims under various privacy statutes of a number of different states, including CIPA).

14.    Numerous other CIPA class actions have settled for less than the cases referenced above and at significantly lower per class member amounts than the settlement reached here. *See, e.g., Batmanghelich v. Sirius XM Radio, Inc.*, C.D. Cal. Case No. 2:09-cv-9190 ($9,480,000 CIPA settlement for over 1,700,000 class members, **$5.77 per class member**); *Roberts v. Wyndham Hotels and Resorts*, LLC, N.D. Cal. Case No. 3:12-cv-05083 ($7,325,000 CIPA settlement for 115,770 for class members, **$63.27 per class member**); *Cohorst v. BRE Properties, Inc. et al*., S.D. Cal. Case No. 3:10-cv-2666 ($5,500,000 CIPA settlement for 1,170,584 class members, **$4.70 per class member**); *Tobajian v. Allstate Corp.*, No. CV 23-753-DMG (PDX), 2023 WL 6813321 (C.D. Cal. Sept. 21, 2023) ($3,300,000 CIPA settlement for 130,005 class members, **$25.38 per class member**); *Nader v. Capital One Bank (USA), N.A.*, C.D. Cal. Case No. 2:12-cv-01265 ($3,000,000 CIPA settlement for 1,100,000 class members,

---

[1] These figures were calculated as follows: 8% of 92,668 class members = 7,413. Net Settlement Fund of $12,950,000 ($19,500,000 - $6,500,000 in attorney's fees, $35,000 in costs, and $15,000 in incentive awards) divided by 7,413 class members = $1,746.93 average settlement payment per class member at an 8% claims rate. 12% of 92,668 class members = 11,120. Net Settlement Fund of $12,950,000 divided by 11,120 class members = $1,164.57 average settlement payment per class member at a 12% claims rate.

DECLARATION OF JACIE C. ZOLNA ISO PLAINTIFFS'                    CASE NO. 3:23-cv-06265-AMO
MOTION FOR CLASS CERT. AND PREL. APPROVAL

1  **$2.73 per class member**); *Knell v. FIA Card Services*, S.D. Cal. Case No. 3:12-cv-426

2  ($2,750,000 CIPA settlement for 3,650,000 class members, **$0.75 per class member**); *Hoffman v.*

3  *Bank of America*, S.D. Cal. Case No. 3:12-cv-00539 ($2,600,000 CIPA settlement for over

4  1,400,000 class members, **$1.86 per class member**); *Nguyen v. Vantiv, Inc.*, N.D. Cal. Case No.

5  3:15-cv-02436 ($2,000,000 CIPA settlement for approximately 35,000 members, **$57.14 per**

6  **class member**).

7          15.     The settlement with the Defendants in this case was the product of extensive arm's

8  length negotiations, including an Early Settlement Conference before the Magistrate Judge Donna

9  M. Ryu on August 15, 2024.

10          16.     Class Counsel is familiar with the claims being settled and the defenses asserted

11  and is aware of the risks of pursuing the litigation any further. Class Counsel undertook

12  exhaustive research of the claims and legal issues involved and conducted a detailed factual

13  investigation. The parties also exchanged lengthy and substantive mediation statements, which set

14  forth their respective factual and legal positions. Voluminous information on call volume was

15  obtained from Defendants and third parties via subpoenas. Furthermore, based on their past

16  experience in CIPA cases in the payment processing industry, Class Counsel knows that the

17  relationship amongst the various defendants in this case are governed by rules published by Visa

18  and MasterCard, which are publicly available. Class Counsel fully analyzed these documents

19  prior to filing suit. The contracts amongst the defendants were also produced in the litigation. The

20  Visa and MasterCard rules and Defendants' contracts are of significant relevance because they

21  define the relationship, obligations, and rights amongst the Defendants, which bear on, among

22  other things, the issue of agency.

23          17.     The Firm was required to spend a significant amount of its time and resources on

24  the Lawsuit, which interfered with the Firm's ability to accept other opportunities. Due to its

25  breadth and complexity, the Lawsuit required lawyers at our Firm, including myself and

26  Benjamin R. Swetland, to work almost exclusively on this case for significant periods of time.

27

28

DECLARATION OF JACIE C. ZOLNA ISO PLAINTIFFS'          CASE NO. 3:23-cv-06265-AMO
MOTION FOR CLASS CERT. AND PREL. APPROVAL

This posed a significant risk to our Firm since the lawyers who worked on this case otherwise would have been involved in other matters or potential opportunities but for the demands this case took on their time. We nonetheless undertook the prosecution of this suit after an analysis of the risks, which were substantial, versus the potential reward of a contingent fee award.

18.    Based on billing records that are kept in the ordinary course of business at the Firm, the Firm has spent 886.43 attorney hours and $800,869.50 in billable attorney time in connection with the Lawsuit as of November 5, 2024. This amount does not include attorney time that has not yet been accounted for or inputted into the Firm's billing software, nor does it include time that the Firm will expend on attending the preliminary approval hearing, preparing the final approval papers, attending the final approval hearing, and attending to settlement administration issues. We will present an updated and more detailed summary of our time to the Court prior to the final approval hearing. The Firm's hourly billing rates are as follows:

Myron M. Cherry, Partner (over 50 years of experience): $1,600

Jacie C. Zolna, Partner (22 years of experience): $950

Benjamin R. Swetland, Associate (13 years of experience): $825

19.    Based on billing records that are kept in the ordinary course of business at the Firm, the Firm has incurred $20,763.12 in costs in connection with the Lawsuit as of November 5, 2024. This amount does not include costs that have not yet been accounted for or otherwise inputted into the Firm's billing software. Once additional costs incurred by the Firm during the months leading up to a final approval hearing are included, I estimate that total unreimbursed costs could range from approximately $30,000 to $35,000. We will present our actual final costs to the Court prior to the final approval hearing.

20.    The Firm retained Jennie Anderson at Andrus Anderson LLP as local counsel in this matter. To date, Andrus Anderson LLP has spent $35,442.50 in billable time in connection with the Lawsuit and has incurred $631.22 in costs. Ms. Anderson's hourly rate is $1,150. A declaration attesting to the attorneys' fees and costs incurred by Andrus Anderson LLP will be

1    submitted to the Court prior to the final approval hearing.

2        21.    Thus, the total amount of attorneys' fees expended by Plaintiffs' counsel to date is

3    $836,312, not including additional time that will be spent on preliminary and final approval and

4    administering the settlement. The requested fees of $6,500,000, therefore, would result in a

5    current lodestar multiplier of 7.77.

6        22.    The two named Plaintiffs will request incentive awards of $7,500 each. Both

7    Plaintiffs stayed significantly involved in the litigation, including reviewing pleadings and other

8    case documents and routinely communicating with Class Counsel. The principals of both

9    Plaintiffs also attended and were active participants in the Early Settlement Conference before the

10   Magistrate Judge Donna M. Ryu. The Early Settlement Conference lasted all day and required out

11   of town travel for both Plaintiffs and an overnight stay in Oakland, California, which interfered

12   with Plaintiffs' ability to operate their small businesses on these days. The incentive awards

13   sought for Plaintiffs are not conditioned on their support for the settlement. Plaintiffs will submit

14   declarations with the fee petition attesting to the efforts they expended in prosecuting this case on

15   behalf of the class.

16       23.    The Firm solicited bids from three settlement administrators, including Angeion

17   Group, Epiq Class Action & Claims Solutions, and Verita Global (formerly KCC). The methods

18   of notice and claims payment in each of these proposal were substantially the same: notice by

19   mail, website, and internet publication and claims payment by paper check or digitally. The

20   parties jointly selected Verita Global as the settlement administrator because it had the lowest bid

21   and because of its prior experience in administering the similar settlement in the *Wang* case

22   referenced above. Verita Global has provided an estimate to our Firm of approximately $124,842

23   to administer this settlement. A copy of the proposal submitted by Verita Global and accepted by

24   the parties is attached as Ex. 4. This proposal, as well as all of the proposals submitted by the

25   settlement administrators listed above, was based on an estimated 50,000 class members. It has

26   since been determined after an analysis of the call data that there are approximately 92,668 class

27

28
                                          7

members. Thus, the settlement administration costs will be greater than $124,842 and likely be at least $200,000.

24.     Under the settlement, Defendants will pay administration costs up to $200,000. In the past two years, Class Counsel has engaged Verita Global (which was KCC at the time) as a class action administrator on the following two occasions: (i) to administer the settlement in the *Wang* suit referenced above, and (ii) to provide notice to a certified class in the lawsuit entitled *Potek, et al. v. City of Chicago*, Case No. 17 CH 10507 (Circuit Court of Cook County, Illinois, Chancery Division).

25.     The parties have selected the Electronic Frontier Foundation as the *cy pres* recipient because its mission includes protecting privacy interests and illegal surveillance, issues which are closely tethered to the privacy and illegal recording claims asserted in the suit. Class Counsel has no prior relationship with the Electronic Frontier Foundation other than having used it as the *cy pres* recipient in the prior *Wang* settlement.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 7, 2024

                                              */s/ Jacie C. Zolna*
                                              Jacie C. Zolna

DECLARATION OF JACIE C. ZOLNA ISO PLAINTIFFS'          CASE NO. 3:23-cv-06265-AMO
MOTION FOR CLASS CERT. AND PREL. APPROVAL

# Ex. 1

REPRESENTATIVE CASES
MYRON M. CHERRY & ASSOCIATES, LLC

**GENERAL CLASS ACTIONS & COMPLEX LITIGATION**

**C.S. Wang v. Wells Fargo Bank, N.A., 16-cv-11223 (N.D. Ill.):** Class action on behalf of businesses whose phone conversations were illegally recorded without consent in violation of the California Invasion of Privacy Act ("CIPA"). The Firm was appointed class counsel and obtained a settlement of $78 Million, which represents the largest settlement ever in a CIPA class action.

**McKenzie-Lopez v. City of Chicago, 15 CH 4802 (Circuit Court of Cook County, Illinois)**
Appointed class counsel in lawsuit challenging the manner in which the City of Chicago operated and enforced its speed and red-light camera program. Obtained first ever settlement in connection with the City's traffic camera program that not only required changes to the City's practices and other injunctive relief, but also monetary relief valued in excess of $125 Million.

**Mansfield v. Air Line Pilots Ass'n Int'l, 06-cv-6869 (N.D. Ill.)**
The firm was appointed lead class counsel and recovered $44 Million for a class of Senior Pilots of United Airlines in a class action, in which United Airlines was an intervening party, alleging that the defendant union improperly distributed the proceeds of $550 Million in convertible notes it received as part of United Airline's bankruptcy. According to published reports at the time, this settlement represented the largest amount ever paid by a union for violation of the duty of fair representation.

**Ventas, Inc. v. Sullivan & Cromwell, 5232-02 (Sup. Ct., D.C.)**
The firm prosecuted an action against a major Wall Street law firm, Sullivan & Cromwell, for legal malpractice resulting from advice given in connection with a complex corporate reorganization that required a payoff of public debt. Shortly before trial, the firm obtained a $25.5 Million settlement, one of the largest settlements or verdicts recorded in a legal malpractice case.

**Otero v. Dart, 12-cv-3148 (N.D. Ill.)**
Lead class counsel in certified class action against the Sherriff of Cook County for alleged unconstitutional detention of individuals acquitted of wrongdoing at trial. The firm obtained an unprecedented settlement that required changes to the Sherriff's release procedures, as well as monetary payments to individual class members.

**Midwest Medical Records Assoc., Inc. v. Brown, 15 CH 16986 (Circuit Court of Cook County, Illinois)**
Class action seeking the return of unlawful filing fees charged by the Cook County Clerk of Court. Obtained decision from the First District Appellate Court of Illinois finding that the voluntary payment doctrine does not apply to the payment of court filing fees. *Midwest Med. Records Ass'n, Inc. v. Brown*, 2018 IL App (1st) 163230. The firm was appointed class counsel and settled the case for $5,218,155, an amount which represented full refunds for the class, as well as injunctive relief that prevented the Clerk from charging the fee at issue in the future.

**Ehret v. Uber Technologies, Inc., 3:14-cv-113-EMC (N.D. Cal.)**
Class counsel in certified class action against Uber for consumer fraud based on misrepresentations regarding gratuity charge. The firm obtained a settlement that provided a full refund to class members of the amount of the gratuity charge that Plaintiff claimed was unlawfully retained by Uber.

**Jacobson v. Bd. of Ed. of City of Chicago, 94 L 5360 (Circuit Court of Cook County, Illinois)**
The firm was retained by other attorneys to take over prosecution of class action brought on behalf of former Chicago public school principals who were unlawfully terminated as a result of a public act that was later found to be unconstitutional. Due to the firms' efforts, the suit settled for $2 Million, an amount sufficient to compensate almost all class members the full amount of their lost wages.

**In re Chicago Sun-Times Circulation Litigation, 04 CH 9757 (Circuit Court of Cook County, Illinois)**
The firm was appointed to the executive committee in a class action on behalf of defrauded purchasers of advertising space in the Chicago Sun Times, which resulted in a settlement of $15 Million in cash and other benefits to the class.

**Muniz v. Rexnord Corp., 04-cv-2405 (N.D. Ill.)**
The firm was appointed co-lead counsel and obtained a $15 Million settlement in a class action against multiple defendants alleging that they had caused toxins to contaminate the groundwater in an area covering approximately 1,000 homes.

**Barnes v. Air Line Pilots Ass'n Int'l, 13-cv-6243 (N.D. Ill.)**
The firm was appointed lead counsel in certified class action brought on behalf of United management pilots against their union challenging an improper methodology of distributing a lump sum payment of $400 Million from United Airlines that was supposed to provide the pilots with retroactive pay. The firm obtained a settlement that compensated each class member with a significant portion of their lost pay.

**Illinois ex rel. Zolna-Pitts v. ATI Holdings, LLC, 12 CH 27483 (Circuit Court of Cook County, Illinois)**
The firm successfully prosecuted a whistleblower suit on behalf of former employee for alleged widespread insurance fraud in connection with the defendants' alleged practice of overbilling for physical therapy services.

**PrimeCo Personal Comm., L.P., v. Ill. Commerce Comm'n, 98 CH 5500 (Circuit Court of Cook County, Illinois)**
One of several firms working together on a class action challenging the constitutionality of a state statute enabling municipalities to enact ordinances imposing a fee or tax on wireless telephone users. After the Illinois Supreme Court affirmed the trial court's declaration that the fee was unconstitutional, our firm was instrumental in obtaining a partial settlement valued at approximately $30 Million. After that, we successfully obtained not only class certification with respect to the plaintiffs, but also obtained certification of a defendant class, and then settled the remaining claims against the defendant class for approximately $18 Million, for a total settlement of approximately $48 Million.

DEFENSE AND GOVERNMENT INVESTIGATIONS

**Contingent Commissions and Bid-Rigging Investigation of Insurance Industry**
The firm was retained by the Illinois Department of Financial and Professional Regulation as a special examiner to assist in its investigation of contingent commissions and related practices, such as steering and bid-rigging, in the insurance industry, including Aon Corporation and Arthur J. Gallagher & Co. In addition to its factual investigation, the firm assisted in coordinating efforts with the Illinois Department of Financial and Professional Regulation and Attorney Generals. Approximately $250 Million was obtained in settlements as a result of this coordinated effort.

**Cheek v. United States, 498 U.S. 192 (1991)**
The firm successfully argued the landmark case regarding the interpretation of willfulness under the criminal provisions of the Internal Revenue Code.

**Castagnola v. Hewlett-Packard Company, 11-cv-5772, 2012 WL 2159385 (N.D. Cal. 2012)**
The firm successfully defended a nationwide class action alleging deceptive advertising in connection with the online marketing of defendant's membership programs and obtained a dismissal of the case in its entirety and with prejudice.

**Additional Government Investigations**
The firm successfully represented companies and individuals being investigated by Attorney Generals, the Federal Trade Commission, and other government agencies throughout the United States, including in Illinois, California, New York, Florida, Texas, Arkansas, Missouri, Iowa, and Wisconsin.

NOTABLE PUBLIC INTEREST CASES

**Konder v. Illinois High Sch. Ass'n, 1:24-cv-259 (N.D. Ill.)**
The firm represented a hearing impaired student who was denied eligibility to compete on his high school wrestling team by the Illinois High School Association ("IHSA") because he transferred schools to accommodate his hearing disability. The firm obtained an injunction reinstating the student's eligibility for the remainder of the season where he took 3rd place in the State individual tournament and 2nd place in the team state tournament. The student went on to wrestle in college. The lawsuit was covered by several news outlets, including CBS Chicago, Fox Chicago, and WGN.

**Lyon v. Illinois High Sch. Ass'n, 13-cv-00173, 2013 WL 140926 (N.D. Ill. 2013) dissolved, 2013 WL 309205 (N.D. Ill. 2013)**
The firm obtained a temporary injunction against the Illinois High School Association ("IHSA") on behalf of a high school athlete enjoining the IHSA from prohibiting him from participating in his high school's wrestling program as a fifth-year senior. While the injunction was later dissolved, the student was allowed to wrestle the remainder of the regular season of his senior year. The lawsuit was profiled in the *Chicago Sun-Times* and on the front page of the *Chicago Daily Law Bulletin*.

**Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers, 191 F.3d 845 (7th Cir. 1999), rev'd, 531 U.S. 159 (2001)**
In litigation and administrative proceedings, the firm stopped the construction of a huge landfill on a parcel of land in Cook and Kane counties. The litigation was pursued in Illinois Circuit, Appellate, and Supreme Courts, as well as the Federal District Court, the Seventh Circuit Court of Appeals, and the U.S. Supreme Court. The firm obtained an injunction and a subsequent order from the Seventh Circuit Court of Appeals banning the construction of the landfill. Although the U.S. Supreme Court later reversed, the firm assisted in negotiating a sale of the property to a government entity. The landfill was never built, and the land became a protected wetland preserve.

OTHER NOTABLE RESULTS

**Siegler v. Illinois Superconductor Corp., 96 CH 5824 (Circuit Court of Cook County, Illinois)**
The firm represented a client for breach of an oral contract for the purchase of securities. The firm obtained a unique, unprecedented decision from the Circuit Court of Cook County confirming that under the Uniform Commercial Code oral contracts for the purchase and sale of securities are enforceable. The firm tried the case and obtained a $6.5 million judgment.

**International Profit Associates, Inc. v. Paisola, 461 F. Supp. 2d 672 (N.D. Ill. 2006)**
The firm obtained an injunction shutting down a website that was posting negative and defamatory information about one its clients and obtained a first-of-its-kind decision on internet law which continues to be cited around the Country.

# Ex. 2

**Current settlement (*Aguilar Auto Repair, Inc., et al. v. Wells Fargo Bank, N.A., et al.*, Case No. 3:23-cv-06265):**

| Case name | Claims released | Total settlement fund | Total number of class members and per class member recovery[1] | Total number of calls and per call recovery[2] | Non-monetary relief | Attorneys' fees and costs (requested) |
|---|---|---|---|---|---|---|
| *Aguilar Auto Repair* | CIPA, Sections 632 and 632.7 | $19,500,000 | 92,668 **($210.43 per class member)** | 149,010 ($130.86 per call) | Yes, prohibition on further recording of California calls without disclosure. | $6,500,000 in attorneys' fees (33.33% of fund) $30,000-$35,000 in costs (estimated) |

**Other CIPA settlements:**

| Case name[3] | Claims released | Total settlement fund | Total number of class members and per class member recovery | Total number of calls and per call recovery | Non-monetary relief | Attorneys' fees and costs |
|---|---|---|---|---|---|---|
| *Wang* | CIPA, Sections 632 and 632.7 | $78,000,000 | 500,790 **($155.75 per class member)** | 1,603,445 ($48.65 per call) | None | $25,593,571.90 in attorneys' fees (33.33% of fund) $435,807.68 in costs |
| *Marenco* | CIPA, Section 632 and other privacy laws of Florida, Maryland, Nevada, New Hampshire, and Washington | $18,000,000 | 4,000,000[4] **($4.50 per class member)** | N/A | Defendant agreed to continue to use an automated disclosure that it voluntarily began using after the suit was filed. | $4,500,000 in attorneys' fees (25% of fund) $9,128.54 in costs |
| *Mirkarimi* | CIPA, Sections 632 and 632.7 | $14,500,000 | 100,541 **($144.22 per class member)** | N/A | Yes, prohibition on further recording of California calls without disclosure | $3,625,000 in attorneys' fees (25% of fund) $104,897.45 in costs |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | for a period of three years. |
| *Medeiros* | CIPA, Sections 632 and 632.7 | $13,000,000 | 1,700,000 (**$7.65 per class member**) | N/A | None | $4,333,333.33 in attorneys' fees (33.33% of fund)<br><br>$340,120 in costs |
| *Reed* | CIPA, Sections 632 and 632.7 | $11,700,000 | 99,884 (**$117.14 per class member**) | 300,000 calls ($39 per call) | Yes, prohibition on further recording of California calls without disclosure for a period of three years. | $2,925,000 in attorneys' fees (25% of fund)<br><br>$106,111.81 in costs |
| *McCabe* | CIPA, Sections 632 and 632.7 | $11,700,000 | 698,000 (**$16.76 per class member**) | N/A | None | $2,925,000 in attorneys' fees (25% of fund)<br><br>$100,000 in costs |

---

[1] Total recovery per class member is based on the total settlement fund prior to deduction of attorneys' fees, costs, administration costs, and incentive awards.

[2] Total recovery per call is based on the total settlement fund prior to deduction of attorneys' fees, costs, administration costs, and incentive awards.

[3] The case names are abbreviated as follows:

*CS Wang & Associate, et al. v. Wells Fargo Bank, N.A., et al.*, 1:16-cv-11223 (N.D. Ill.) ("*Wang*")
*Marenco v. Visa, Inc.,* C.D. Cal. Case No. 2:10-cv-08022 ("*Marenco*")
*Mirkarimi v. Nevada Prop. 1, LLC*, No. 12CV2160 BTM (DHB), 2016 WL 795878 (S.D. Cal. Feb. 29, 2016) ("*Mirkarimi*")
*Medeiros v. HSBC Card Servs., Inc.*, No. CV1509093JVSAFMX, 2017 WL 11632870 (C.D. Cal. Oct. 23, 2017) ("*Medeiros*")
*Reed v. 1-800 Contacts, Inc.*, No. 12-CV-02359 JM BGS, 2014 WL 29011 (S.D. Cal. Jan. 2, 2014) ("*Reed*")
*McCabe v. Six Continents Hotels, Inc.*, N.D. Cal. Case No. 3:12-cv-04818 ("*McCabe*")

[4] The number of class members in *Marenco* was never definitively provided. According to the settlement administrator, the defendant estimated that there were as many as 4,000,000 potential class members, but only had addresses for approximately 500,000 of them. The defendant later provided the settlement administrator with 494,452 names and addresses it had in its records. After removing duplicates, the settlement administrator mailed notice to 399,151 recipients. Plaintiff's counsel, on the other hand, estimated that there were 600,000 class members in their motion for preliminary approval, although it is possible that estimate was based on the number of class members for whom the defendant had names and addresses.

**Ex. 3**

**Current settlement (*Aguilar Auto Repair, Inc., et al. v. Wells Fargo Bank, N.A., et al.*, Case No. 3:23-cv-06265):**

| Case name | Method of Notice | The number and % of claims submitted | The average settlement payment to class members who submitted a claim | Amount distributed to *cy pres* recipient | Administrative costs | Total exposure |
|---|---|---|---|---|---|---|
| *Aguilar Auto Repair* | Mail, online advertising, and website | TBD (estimated to be between 8%-12% | TBD ($1,164.57-$1,746.93 based on estimate of 8%-12% claims rate) | TBD | $200,000 (estimated) $200,000 of which is paid by Defendants separate from the settlement fund. | $745,050,000 |

**Other CIPA settlements:**

| Case name[1] | Method of Notice | The number and % of claims submitted | The average settlement payment to class members who submitted a claim | Amount distributed to *cy pres* recipient | Administrative costs | Total exposure |
|---|---|---|---|---|---|---|
| *Wang* | Mail, online advertising, and website | 56,330 claims (11.25%) covering 196,239 calls | $900.96 per claim ($258.62 per call) | $5,725,475.46 | $1,194,284.32 (paid from the settlement fund) | $8,017,225,000 |
| *Marenco* | Mail, publication in newspapers, online advertising, and website | 15,204 (3.81%)[2] | $810.50[3] | $403,457.65 | $1,150,000—$1,180,000 (paid from the settlement fund) | Unable to determine[4] |

| | | | | | |
|---|---|---|---|---|---|
| *Mirkarimi* | Mail, publication in newspapers, website | 13,660 (13.6%) | $761.70 | N/A | $334,000 (paid from the settlement fund) | $502,705,000[5] |
| *Medeiros* | Mail or email, publication in newspapers, website | 237,621 (13.8%) | $31.59[6] | N/A | $803,182 (paid from the settlement fund) | $8,500,000,000[7] |
| *Reed* | Mail, publication in newspapers, website | 13,665 (13.7%) | $606.56 | N/A | $370,211.50 (paid from the settlement fund) | $1,500,000,000 |
| *McCabe* | Mail, publication in newspapers, online advertising, and website | 36,430 (5.2%) | $209.40 | $252,375.48 | $491,684 (paid from the settlement fund) | $3,490,000,000[8] |

---

[1] The case names are abbreviated as follows:

    *CS Wang & Associate, et al. v. Wells Fargo Bank, N.A., et al.*, 1:16-cv-11223 (N.D. Ill.) ("*Wang*")
    *Marenco v. Visa, Inc.,* C.D. Cal. Case No. 2:10-cv-08022 ("*Marenco*")
    *Mirkarimi v. Nevada Prop. 1, LLC*, No. 12CV2160 BTM (DHB), 2016 WL 795878 (S.D. Cal. Feb. 29, 2016) ("*Mirkarimi*")
    *Medeiros v. HSBC Card Servs., Inc.*, No. CV1509093JVSAFMX, 2017 WL 11632870 (C.D. Cal. Oct. 23, 2017) ("*Medeiros*")
    *Reed v. 1-800 Contacts, Inc.*, No. 12-CV-02359 JM BGS, 2014 WL 29011 (S.D. Cal. Jan. 2, 2014) ("*Reed*")
    *McCabe v. Six Continents Hotels, Inc*., N.D. Cal. Case No. 3:12-cv-04818 ("*McCabe*")

[2] The 3.81% response rate was calculated using the number of notices directly mailed to class members (399,151), not the actual number of class members as that number was never definitively determined and estimated between 600,000—4,000,000. *See* endnote 4 to Ex. 2.

[3] This figure was calculated by taking the $18,000,000 settlement fund less $4,500,000 in attorneys' fees, $9,128.54 in costs, the $18,000 incentive award, and $1,150,000 in administrative costs, which equals $12,322,871.50. $12,322,871.50/15,204 claims = $810.50

[4] The total exposure in the *Marenco* case was not able to be determined because the case involved CIPA claims and claims under the laws of other states that had different statutory damage amounts. No information was found on how many class members were California residents and had CIPA claims and how many resided outside of California and had claims under statutes other than CIPA.

---

[5] Total exposure in *Mirkarimi* is based on the number of class members (100,541) not the number of calls because we were unable to determine the number of calls at issue in this suit.

[6] This figure was calculated by taking the $13,000,000 settlement fund less $4,333,333.33 in attorneys' fees, $340,120 in costs, $17,500 in incentive awards, and $803,182 in administrative costs, which equals $7,505,864.67. $7,505,864.67/237,621 claims = $31.59

[7] Total exposure in *Medeiros* is based on the number of class members (1,700,000) not the number of calls.

[8] Total exposure in *McCabe* is based on the number of class members (698,000) not the number of calls.

# Ex. 4



**Aguilar Auto Repair, LLC, et al. v. Wells Fargo Bank, N.A**

Contact: Carla Peak | 610.304.4308 | cpeak@veritaglobal.com
Scenario 2: Double Postcard with Detachable Claim Form

October 2, 2024

# Key Assumptions Used in Estimate Preparation

| | |
|---|---|
| Class Size (number of members): | 50,000 |
| Case Duration (months): | 12 |
| Number of Electronic, Finalized Data Files Provided (Excel, Access, etc.): | 1 |
| | |
| CAFA Notice Required? | Yes |
| | |
| Claims Processing: | Yes |
| Address Searches: | Yes |
| % of returned notices to be forwarded: | 1% |
| % of returned undeliverable notices: | 10% |
| % of successful address searches: | 60% |
| Media Campaign Required: | Yes |
| Expert Media Services: | No |
| Translations Required: | Yes |
| Number of Email Campaigns: | N/A |
| % of emails bounced back ("Bouncebacks"): | N/A |
| Reminder Mailing: | No |
| | |
| Duration of Claims Filing Period (weeks): | 8 |
| Business Reply Mail ("BRM" or "pre-paid" postage): | Yes |
| Documentation Required to file a claim: | No |
| % of class members that will file a claim: | 10% |
| % of claims filed online: | 80% |
| % of claims filed by phone: | 0% |
| % of claims filed by postal mail: | 20% |
| % of deficient claims filed by postal mail: | 5% |
| | |
| Type of Telephone Support: | IVR w/ Punchthrough |
| Telephonic Claims Filing: | No |
| % of class that will call: | 3% |
| % of callers that will punch through to a Live Operator: | 5% |
| % of callers that will request a Notice Packet: | 5% |
| Duration of Telephone Support (months): | 12 |
| | |
| Type of Website Support: | Dynamic |
| Online Claims Filing: | Yes |
| Duration of Website Support (months): | 12 |

### Summary of Costs

| | |
|---|---|
| Estimated Claims Filing Rate: | 10% |
| Estimated # of Claims Filed: | 5,000 |
| **Notice Procedures** | **$75,452** |
| **Class Member Support** | **$8,094** |
| **Claims Administration** | **$14,288** |
| **Disbursement & Tax Reporting** | **$17,622** |
| **Residual Disbursement** | **$9,571** |
| **Sub-Total Administration Costs** | **$125,026** |
| **Less Client Courtesy Discount****** | **($35,000)** |
| **Total Est. Cost, with Discount**** | **$90,026** |
| | |
| **Plus Estimated Postage*** | **$34,815** |
| **Total Estimated Cost W/Postage**** | **$124,842** |

See Additional Services below



# Aguilar Auto Repair, LLC, et al. v. Wells Fargo Bank, N.A

Contact: Carla Peak | 610.304.4308 | cpeak@veritaglobal.com
Scenario 2: Double Postcard with Detachable Claim Form

October 2, 2024

| Notice Procedures | Response Rate | Quantity | Unit | Rate Per Unit | Estimated Cost | Total |
|---|---|---|---|---|---|---|
| **Data and Forms Set-up** | | | | | | |
| Intake and Process Data, Set up Case Management System | | 20 | hrs | $160.00 | $3,200 | |
| Format Document(s) | | 20 | hrs | $85.00 | $1,700 | |
| Translate Documents into Spanish | | 6,184 | words | $0.226 | $1,400 | |
| Sub-total of Data and Forms Set-up | | | | | | $6,300 |
| | | | | | | |
| **CAFA Mailing** | | | | | | |
| CAFA Mailing to State Attorneys General and US Attorney General | | 1 | time(s) | $1,100.00 | $1,100 | |
| Sub-total of CAFA Mailing | | | | | | $1,100 |
| | | | | | | |
| **Reverse Phone Lookups (Current) - Search 1** | | | | | | |
| Number of Searches Performed | | 50,000 | units | $0.05 | $2,500 | |
| Number of Addresses Found | 60% | 30,000 | units | | | |
| Staff Time for Searches | | 5 | hrs | $85.00 | $425 | |
| Sub-total of Reverse Phone Lookups (Current) - Search 1 | | | | | | $2,925 |
| | | | | | | |
| **Reverse Phone Lookups (Historical) - Search 1** | | | | | | |
| Number of Searches Performed | | 50,000 | units | $0.05 | $2,500 | |
| Number of Addresses Found | 60% | 30,000 | units | | | |
| Staff Time for Searches | | 5 | hrs | $85.00 | $425 | |
| Sub-total of Reverse Phone Lookups (Historical) - Search 1 | | | | | | $2,925 |
| | | | | | | |
| **Reverse Phone Lookups (Current) - Search 2** | | | | | | |
| Number of Searches Performed | | 20,000 | units | $0.10 | $2,000 | |
| Number of Addresses Found | 30% | 6,000 | units | | | |
| Staff Time for Searches | | 5 | hrs | $85.00 | $425 | |
| Sub-total of Reverse Phone Lookups (Current) - Search 2 | | | | | | $2,425 |
| | | | | | | |
| **Reverse Phone Lookups (Historical) - Search 2** | | | | | | |
| Number of Searches Performed | | 20,000 | units | $0.10 | $2,000 | |
| Number of Addresses Found | 30% | 6,000 | units | | | |
| Staff Time for Searches | | 5 | hrs | $85.00 | $425 | |
| Sub-total of Reverse Phone Lookups (Historical) - Search 2 | | | | | | $2,425 |
| | | | | | | |
| **Print/Mail Notice Packet** | | | | | | |
| NCOA Updates | | 72,000 | units | | $250 | |
| Double Postcard with Detachable Claim Form | | 72,000 | units | $0.075 | $5,400 | |
| Print Production Management | | 10 | hrs | $85.00 | $850 | |
| Forwarding of Returned Mail with USPS Forwarding Addresses | 1% | 720 | units | $0.306 | $220 | |
| Data Entry for Re-mails to New Addresses | | 720 | units | $0.50 | $360 | |
| Returned Undeliverable Mail | 10% | 7,200 | units | | | |
| Handling of Returned Undeliverable Mail | | 4 | hrs | $85.00 | $340 | |
| Sub-total of Print/Mail Notice Packet | | | | | | $7,420 |
| | | | | | | |
| **Address Searches/Re-mails** | | | | | | |
| Number of Address Searches Performed | | 7,200 | units | $0.10 | $720 | |
| Number of New Addresses Found | 60% | 4,320 | units | | | |
| Re-mails to Found Addresses | | 4,320 | units | $0.31 | $1,322 | |
| Staff Time for Address Searches/Re-mails | | 5 | hrs | $85.00 | $425 | |
| Sub-total of Address Searches/Re-mails | | | | | | $2,467 |
| | | | | | | |
| **Media Campaign** | | | | | | |
| Digital Media | | | | | | |
| - Approx. 7,000,000 digital media impressions may be purchased programmatically via Google Display Network and Facebook. The impressions will be targeted to Adults 18+ in California. (30-day duration) | | 7,000,000 | impressions | | | |
| Media/Production | | | | | $15,000 | |
| Sub-total of Media Campaign | | | | | | $15,000 |
| | | | | | | |
| **Website Set-up & Maintenance** | | | | | | |
| Design & Set up Dynamic Website | | 40 | hrs | $160.00 | $6,400 | |
| Website Domain Registration (for duration of website) | | | | | $175 | |
| Maintenance | | 12 | hrs | $160.00 | $1,920 | |
| Server Space rental | | 12 | mos | $10.00 | $120 | |
| Sub-total of Website Set-up & Maintenance | | | | | | $8,615 |



# Aguilar Auto Repair, LLC, et al. v. Wells Fargo Bank, N.A

**Contact: Carla Peak | 610.304.4308 | cpeak@veritaglobal.com**
Scenario 2: Double Postcard with Detachable Claim Form

**October 2, 2024**

### Case Management, Opt Out Processing, and Declaration of Notice Procedures

| | | | | | |
|---|---|---|---|---|---|
| Case Management | | 100 | hrs | $185.00 | $18,500 |
| Principal Project Management | | 10 | hrs | $290.00 | $2,900 |
| Opt-Out/Objection Processing (per hr) | | 5 | hrs | $85.00 | $425 |
| Correspondence Processing | | 5 | hrs | $85.00 | $425 |
| Declaration of Notice Procedures | | 10 | hrs | $160.00 | $1,600 |
| **Sub-total of Case Management, Opt Out Processing, and Declaration of Notice Procedures** | | | | | $23,850 |
| | | | | | |
| **Sub-total of Notice Procedures** | | | | | $75,452 |

| Class Member Support | Response Rate | Quantity | Unit | Rate Per Unit | Estimated Cost | Total |
|---|---|---|---|---|---|---|
| **Automated Call Support** | | | | | | |
| Toll Free Phone Line & System Set-up Cost | | | | | $1,575 | |
| Script Drafting and Management | | 15 | hrs | $160.00 | $2,400 | |
| Monthly Maintenance Fees | | 12 | mos | $25.00 | $300 | |
| Estimated # of Calls | 3% | 1,500 | calls | | | |
| - Average Call Duration (minutes) | | 3 | mins | | | |
| - IVR Line Charges | | 4,500 | mins | $0.02 | $90 | |
| Projected # of Punchthroughs to Live Operator  (3 weeks) | | 75 | calls | | | |
| - Average Call Duration (minutes) | | 3 | mins | | | |
| - IVR Transfer Line Charges | | 225 | mins | $0.02 | $5 | |
| - Live Operator Line Charges | | 225 | mins | $0.95 | $214 | |
| Long-Form Notice Packet Requests | 5% | 75 | units | | | |
| - Fulfill Notice Packet Requests | | 75 | units | $1.87 | $140 | |
| - Print Production Management | | 4 | hrs | $85.00 | $340 | |
| Transcriptions | | 75 | units | $0.60 | $45 | |
| Staff Time Downloading Transcribed Data (30 min/month x 12 months) | | 6 | hrs | $85.00 | $510 | |
| **Sub-total of Automated Call Support** | | | | | | $5,619 |
| | | | | | | |
| **Email Handling** | | | | | | |
| Establish Email Inbox for Correspondence | | | | | $350 | |
| Estimated # of Emails | 1% | 500 | units | | | |
| - Average Email Duration (minutes) | | 3 | mins | | | |
| Staff Time Responding to Emails | | 25 | hrs | $85.00 | $2,125 | |
| **Sub-total of Email Handling** | | | | | | $2,475 |
| | | | | | | |
| **Sub-total of Class Member Support** | | | | | | $8,094 |

| Claims Administration | Response Rate | Quantity | Unit | Rate Per Unit | Estimated Cost | Total |
|---|---|---|---|---|---|---|
| **Estimated # of Claims** | **10%** | **5,000** | **claims** | | | |
| **Process Claims Filed Online** | 80% | 4,000 | claims | $0.35 | $1,400 | |
| **Process Claims Filed by Postal Mail** | 20% | 1,000 | claims | | | |
| Staff Hours Processing Claims | | 34 | hrs | $75.00 | $2,550 | |
| Data Entry & Claim Scoring Set-up | | | | | $895 | |
| Open/Image Forms | | 1,000 | claims | $1.85 | $1,850 | |
| **Estimated BRM Postage on Filed Claims (Postcard Return)** | | 1,000 | claims | $0.704 | (actual) | |
| **Deficiency Notices** | 5% | 50 | units | | | |
| Print/Mail Deficiency Letters | | 50 | units | $1.25 | $63 | |
| Process Deficiency Responses | | 3 | min/response | | | |
| Staff Hours  Reviewing Responses | | 3 | hrs | $75.00 | $225 | |
| Open/Image Forms | | 50 | units | $1.85 | $93 | |
| **W9 Solicitation** | | | | | | |
| Email W9 Solicitation Notification | 90% | 4,500 | units | $0.334 | $1,503 | |
| Email Campaign Management | | 10 | hrs | $85.00 | $850 | |
| Process W9s Submitted Online | | 4,500 | units | $0.10 | $450 | |
| 2-page W9 Solicitation Letter, #10 Window Envelope | 10% | 500 | units | $0.37 | $185 | |
| Print Production Management | | 5 | hrs | $85.00 | $425 | |
| Staff Hours Processing Responses | | 17 | hrs | $75.00 | $1,275 | |
| Open/Image Form | | 500 | units | $1.85 | $925 | |
| **Status Reports** | | 10 | hrs | $160.00 | $1,600 | |
| | | | | | | |
| **Sub-total of Claims Administration** | | | | | | $14,288 |

**verita**

# Aguilar Auto Repair, LLC, et al. v. Wells Fargo Bank, N.A

Contact: Carla Peak | 610.304.4308 | cpeak@veritaglobal.com
Scenario 2: Double Postcard with Detachable Claim Form

**October 2, 2024**

| Disbursement & Tax Reporting | Response Rate | Quantity | Unit | Rate Per Unit | Estimated Cost | Total |
|---|---|---|---|---|---|---|
| Estimated # of Approved Claims | | 5,000 | units | | | |
| Estimated % Electing Amazon / PayPal / Venmo | 75% | 3,750 | units | | | |
| Estimated % Electing Zelle | 5% | 250 | units | | | |
| Estimated % Electing Check Payment | 20% | 1,000 | units | | | |
| | | | | | | |
| Funds Management, Obtain Tax ID | | 10 | hrs | $160.00 | $1,600 | |
| Distribution Calculations & Prep | | 35 | hrs | $120.00 | $4,200 | |
| Issue Payments via Amazon / PayPal / Venmo | | 3,750 | units | $0.20 | $750 | |
| PayPal / Venmo Failures | 5% | 188 | units | | | |
| Issue Payments via Zelle | | 250 | units | $0.35 | $88 | |
| Zelle Failures | 5% | 13 | units | | | |
| Print/Mail Checks to Failed PayPal / Venmo / Zelle w/Form 1099 | | 200 | cks | $0.22 | $44 | |
| Print/Mail Checks w/Form 1099 | | 1,000 | cks | $0.22 | $220 | |
| Distribution Management | | 20 | hrs | $290.00 | $5,800 | |
| Issue Forms 1099 MISC/INT | | 3,800 | units | $0.30 | $1,140 | |
| Forms 1099 Reporting (annual) | | 1 | yrs | $100.00 | $100 | |
| Returned Undeliverable Checks | 1% | 10 | units | | | |
| Handling of Returned Undeliverable Mail | | 1 | hrs | $85.00 | $85 | |
| Reissue Checks | 1% | 10 | cks | $4.50 | $45 | |
| Post-Distribution Follow-up & Reports | | 15 | hrs | $120.00 | $1,800 | |
| Settlement Fund Tax Returns (annual) | | 1 | yrs | $1,750.00 | $1,750 | |
| | | | | | | |
| Sub-total of Disbursement & Tax Reporting | | | | | | $17,622 |

| Residual Disbursement | Response Rate | Quantity | Unit | Rate Per Unit | Estimated Cost | Total |
|---|---|---|---|---|---|---|
| Estimated # of Residual Payments | | 4,760 | units | | | |
| Estimated # Receiving Amazon / PayPal / Venmo | | 3,563 | units | | | |
| Estimated # Receiving Zelle | | 238 | units | | | |
| Estimated % Check Payments Cashed | 80% | 960 | units | | | |
| | | | | | | |
| Funds Management | | 5 | hrs | $160.00 | $800 | |
| Distribution Calculations & Prep | | 15 | hrs | $120.00 | $1,800 | |
| Issue Payments via Amazon / PayPal / Venmo | | 3,563 | units | $0.20 | $713 | |
| PayPal / Venmo Failures | 5% | 178 | units | | | |
| Issue Payments via Zelle | | 238 | units | $0.35 | $83 | |
| Zelle Failures | 5% | 12 | units | | | |
| Print/Mail Checks to Failed PayPal / Venmo / Zelle | | 190 | cks | $0.17 | $32 | |
| Print/Mail Checks | | 960 | cks | $0.17 | $163 | |
| Distribution Management | | 10 | hrs | $290.00 | $2,900 | |
| Returned Undeliverable Checks | 1% | 10 | units | | | |
| Handling of Returned Undeliverable Mail | | 1 | hrs | $85.00 | $85 | |
| Reissue Checks | 1% | 10 | cks | $4.50 | $45 | |
| Post-Distribution Follow-up & Reports | | 10 | hrs | $120.00 | $1,200 | |
| Settlement Fund Tax Returns (annual) | | 1 | yrs | $1,750.00 | $1,750 | |
| | | | | | | |
| Sub-total of Residual Disbursement | | | | | | $9,571 |
| | | | | | | |
| SUB-TOTAL ADMINISTRATION COSTS | | | | | | $125,026 |
| LESS CLIENT COURTESY DISCOUNT**** | | | | | | ($35,000) |
| TOTAL ESTIMATED COST, WITH DISCOUNT | | | | | | $90,026 |
| | | | | | | |
| [1] Plus Estimated Postage* | | | | | | $34,815 |
| TOTAL ESTIMATED COST w/POSTAGE** | | | | | | $124,842 |

[1] Postage is an estimate and will be determined at the time of mailing. The USPS reserves the right to propose an increase in postage every 60 days.



# Aguilar Auto Repair, LLC, et al. v. Wells Fargo Bank, N.A

Contact: Carla Peak | 610.304.4308 | cpeak@veritaglobal.com
Scenario 2: Double Postcard with Detachable Claim Form

**October 2, 2024**

| Additional Services | Response Rate | Quantity | Unit | Rate Per Unit | Estimated Cost | Total |
|---|---|---|---|---|---|---|
| **Residual Distribution - Reportable Payments** | | | | | | |
| Issue Forms 1099 MISC | | 4,760 | units | $0.30 | $1,428 | |
| Forms 1099 Reporting (annual) | | 1 | yrs | $100.00 | $100 | |
| **Sub-total of Residual Distribution - Reportable Payments** | | | | | | $1,528 |
| **Plus Estimated Postage\*** | | | | | | $2,785 |
| **Sub-total of Residual Distribution - Reportable Payments, Plus Estimated Postage\*** | | | | | | $4,313 |

| Standard Hourly Rates | Rate Per Unit |
|---|---|
| **Verita Standard Hourly Rates** | |
| Principal | $290.00 |
| Director | $235.00 |
| Sr. Manager | $185.00 |
| Manager | $160.00 |
| Supervisor | $120.00 |
| Staff | $60.00 - $85.00 |

| Other Services And Out-Of-Pocket Expenses | Rate Per Unit |
|---|---|
| Other Services and Ad Hoc Reporting, as needed or requested | (standard hourly rates) |
| Other Charges and Out-of-Pocket Costs\*\*\* | (actual) |

  * Estimated Postage and Handling.
  ** Does not include applicable taxes or escheatment services.
  *** Includes, but is not limited to long distance calls, overnight shipping, photocopies, storage, PO Box rentals, broker fees, etc.
  *** Discount is contingent upon no significant change in the scope of work.

This Settlement Administration Estimate and the attached Cost Summary & Scope of Services (together, the "Proposal") are valid for ninety days from October 02, 2024.  After such period, Verita reserves the right to amend the Proposal (including,

All services to be provided to the undersigned (the "Client") and all fees and costs set forth in the Proposal are subject to the terms, specifications, assumptions and conditions set forth in the Proposal and the attached Terms and Conditions (the "Terms of Service"). The estimated fees and charges in the Proposal are based on certain information provided to Verita as well as significant assumptions. Accordingly, this estimate is not intended to limit Verita's actual fees and charges, which may be less or more than estimated due to the scope of actual services or changes to the underlying facts or assumptions.

Verita Global, LLC

BY: _____  DATE: _____

TITLE:

Financially Responsible Party

BY: _____  DATE: _____

TITLE:

**verita**

# TERMS AND CONDITIONS

All services to be provided by Verita Global, LLC (together with its affiliates, "Verita"), including services provided to Client as set forth in the attached Proposal, are subject to the following Terms and Conditions:

**1.  SERVICES**. Verita agrees to provide the services set forth in the Proposal attached hereto (the "Services"). Capitalized terms not otherwise defined herein have the meanings given to such terms in the Proposal.  Verita will often take direction from Client's representatives, employees, agents and/or professionals (collectively, the "Client Parties") with respect to the Services. The parties agree that Verita may rely upon, and Client agrees to be bound by, any direction, advice or information provided by the Client Parties to the same extent as if provided by Client. Client agrees and understands that Verita shall not provide Client or any other party with any legal advice.

**2.  PRICES, CHARGES AND PAYMENT**. Verita agrees to charge and Client agrees to pay, subject to the terms herein, Verita for its fees and charges as set forth in the Proposal. Client acknowledges that any estimate in the Proposal is based on information provided by Client to Verita and actual fees and charges may vary depending on the circumstances and length of the case. Notwithstanding the foregoing, where total charges are expected to exceed $10,000 in any single month, Verita may require advance payment from Client due and payable upon demand and prior to the performance of services. Verita's prices are inclusive of commission and other charges and are generally adjusted periodically to reflect changes in the business and economic environment. Verita reserves the right to reasonably increase its prices, charges and rates annually. If any such increase exceeds 10%, Verita will give thirty (30) days written notice to Client. Client agrees to pay the reasonable out of pocket expenses incurred by Verita in connection with Services, including, but not limited to, transportation, lodging, and meals.

Verita agrees to submit its invoices to Client and Client agrees that the amount invoiced is due and payable upon receipt. If any amount is unpaid as of thirty (30) days from the receipt of the invoice, the Client further agrees to pay a late charge (the "Finance Charge"), calculated as one and one-half percent (1-1/2%) of the total amount unpaid every thirty 30) days. In the case of a dispute in the invoice amount, Client shall give written notice to Verita within twenty (20) days of receipt of the invoice by Client. Client agrees the Finance Charge is applicable to instances where Verita agreed to provide certain pre-settlement work while deferring the billing of said work until the settlement phase.

**3.  FURTHER ASSURANCES**. Client agrees that it will use its best efforts to include provisions reasonably acceptable to Verita in any relevant court order, settlement agreement or similar document that provide for the payment of Verita's fees and expenses hereunder.  No agreement to which Verita is not a party shall reduce or limit the full and prompt payment of Verita's fees and expenses as set forth herein and in the Proposal.

**4.  RIGHTS OF OWNERSHIP**. The parties understand that the software programs and other materials furnished by Verita to Client and/or developed during the course of the performance of Services are the sole property of Verita. The term "program" shall include, without limitation, data processing programs, specifications, applications, routines, and documentation. Client agrees not to copy or permit others to copy the source code from the support software or any other programs or materials furnished to Client. Fees and expenses paid by Client do not vest in Client any rights in such property, it being understood that such property is only being made available for Client's use during and in connection with the Services provided by Verita.

**5.  CONFIDENTIALITY**. Each of Verita and Client, on behalf of themselves and their respective employees, agents, professionals and representatives, agrees to keep confidential all non-public records, systems, procedures, software and other information received from the other party in connection with the Services; provided, however, that if either party reasonably believes that it is required to produce any such information by order of any governmental agency or other regulatory body it may, upon not less than five (5) business days' written notice to the other party, release the required information. These provisions shall survive termination of Services.  Verita will not accept, and Client agrees not to send, any information that may be deemed protected health information under state or federal law without the consent of the data subjects or pursuant to the terms of an agreed qualified protective order entered by a court of competent jurisdiction.

**6.  DOCUMENT RETENTION.**  All data and records received in connection with the Services will be destroyed no later than six months after case closing, absent client agreement or legal requirement.  Telephone call recordings will be stored for no longer than ten days.  Retention outside of Verita's standard schedule may result in additional storage charges to Client.

**verita**

# TERMS AND CONDITIONS

**7.  BANK ACCOUNTS**. At Client's request, Verita shall be authorized to establish accounts with financial institutions as agent for Client or as otherwise agreed by the parties. All Client accounts established by Verita shall be deposit accounts of commercial banks with Tier 1 Capital exceeding $1 billion and bank ratings of investment grade (each, an "Approved Bank"). Notwithstanding the foregoing, the parties may utilize any financial institution or electronic payment service provider specified in the Proposal in connection with the services to be provided hereunder, or as otherwise agreed to in writing, which institution or provider will be deemed an Approved Bank.  In some cases, Verita may derive financial benefits from financial institutions resulting from settlement funds and other moneys on deposit or invested with them including, for example, discounts provided on certain banking services and service fees.  The amounts held pursuant to these Terms and Conditions ("Amounts Held") are at the sole risk of Client and, without limiting the generality of the foregoing, Verita shall have no responsibility or liability for any diminution of the fund that may result from any deposit made with an Approved Bank including any losses resulting from a default by the Approved Bank or other credit losses.  Verita shall have no responsibility or liability for any claims or losses arising from or related to the delivery of electronic payments.  It is acknowledged and agreed that Verita will have acted prudently in depositing the fund at any Approved Bank, and Verita is not required to make any further inquiries in respect of any such bank.

Client hereby authorizes Verita to stop payment of checks issued in payment of settlement proceeds, if applicable, but not presented for payment, when the payees thereof allege either that they have not received the checks or that such checks have been mislaid, lost, stolen, destroyed or, through no fault of theirs, are otherwise beyond their control and cannot be produced by them for presentation and collection, and Verita shall issue and deliver duplicate checks in replacement thereof.  Client shall indemnify Verita against any loss or damage resulting from reissuance of the checks.  Further, in the event payees present their checks for payment through electronic or mobile deposit and subsequently present their checks for payment, at which point they are dishonored, Client shall indemnify Verita against any loss or damage resulting from the double presentment, including any holder in due course claims.

**8.  TERMINATION**. The Services may be terminated by either party (i) upon thirty (30) days' written notice to the other party or (ii) immediately upon written notice for Cause (defined herein). As used herein, the term "Cause" means (i) gross negligence or willful misconduct of Verita that causes serious and material harm to Client, (ii) the failure of Client to pay Verita invoices for more than sixty (60) days from the date of invoice, or (iii) the accrual of invoices or unpaid services where Verita reasonably believes it will not be paid. Termination of Services shall not relieve Client of its obligations to pay all fees and expenses incurred prior to such termination.

In the event that the Services are terminated, regardless of the reason for such termination, Verita shall reasonably coordinate with Client to maintain an orderly transfer of data, programs, storage media or other materials furnished by Client to Verita or received by Verita in connection with the Services. Client agrees to pay for such services in accordance with Verita's then existing prices for such services.

**9.  LIMITATIONS OF LIABILITY AND INDEMNIFICATION**. Client shall indemnify and hold Verita, its affiliates, members, directors, officers, employees, consultants, subcontractors and agents (collectively, the "Indemnified Parties") harmless, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, judgments, liabilities and expenses (including reasonable counsel fees and expenses) (collectively, "Losses") resulting from, arising out of or related to Verita's performance of Services. Such indemnification shall exclude Losses resulting from Verita's gross negligence or willful misconduct. Without limiting the generality of the foregoing, Losses include any liabilities resulting from claims by any third-parties against any Indemnified Party. Client shall notify Verita in writing promptly upon the assertion, threat or commencement of any claim, action, investigation or proceeding that Client becomes aware of with respect to the Services provided by Verita.

Except as provided herein, Verita's liability to Client or any person making a claim through or under Client or in connection with Services for any Losses of any kind, even if Verita has been advised of the possibility of such Losses, whether direct or indirect and unless due to gross negligence or willful misconduct of Verita, shall be limited to the total amount billed or billable for the portion of the particular work which gave rise to the alleged Loss. In no event shall Verita's liability for any Losses, whether direct or indirect, arising out of the Services exceed the greater of (i) the total amount billed and paid by or through Client for the Services and (ii) solely in the event of any loss of the Amount Held caused by Verita's gross negligence or willful misconduct, the total Amount Held under Section 6.  In no event shall Verita be liable for any indirect, special or consequential damages such as loss of anticipated profits or other economic loss in connection with or arising out of the Services. Except as expressly set forth herein, Verita makes no representations or warranties, express or implied, including,

# verita

## TERMS AND CONDITIONS

but not limited to, any implied or express warranty of merchantability, fitness or adequacy for a particular purpose or use, quality, productiveness or capacity. The provisions of this Section 9 shall survive termination of Services.

**10. FORCE MAJEURE.** Verita will not be liable for any delay or failure in performance when such delay or failure arises from circumstances beyond its reasonable control, including without limitation acts of God, acts of government in its sovereign or contractual capacity, acts of public enemy or terrorists, acts of civil or military authority, war, riots, civil strife, terrorism, blockades, sabotage, rationing, embargoes, epidemics, pandemics, outbreaks of infectious diseases or any other public health crises, earthquakes, fire, flood, other natural disaster, quarantine or any other employee restrictions, power shortages or failures, utility or communication failure or delays, labor disputes, strikes, or shortages, supply shortages, equipment failures, or software malfunctions.

**11. INDEPENDENT CONTRACTORS.** Verita is and shall be an independent contractor of Client and no agency, partnership, joint venture or employment relationship shall arise, directly or indirectly, as a result of the Services or these Terms and Conditions.

**12. NOTICES.** All notices and requests hereunder shall be given or made upon the respective parties in writing and shall be deemed as given as of the third day following the day it is deposited in the U.S. Mail, postage pre-paid or on the day it is given if sent by facsimile or on the day after the day it is sent if sent by overnight courier to the appropriate address set forth in the Proposal or to such other address as the party to receive the notice or request so designates by written notice to the other.

**13. APPLICABLE LAW.** These Terms and Conditions will be governed by and construed in accordance with the laws of the State of California, without giving effect to any choice of law principles.

**14. ENTIRE AGREEMENT; MODIFICATIONS; SEVERABILITY; BINDING EFFECT.** These Terms and Conditions, together with the Proposal delivered pursuant hereto, constitutes the entire agreement and understanding of the parties in respect of the subject matter hereof and supersede all prior understandings, agreements or representations by or among the parties, written or oral, to the extent they relate in any way to the subject matter hereof. If any provision herein shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby. These Terms and Conditions may be modified only by a written instrument duly executed by the parties. All of the terms, agreements, covenants, representations, warranties and conditions of these Terms and Conditions are binding upon, and inure to the benefit of and are enforceable by, the parties and their respective successors and permitted assigns.

Aguilar Auto Repair, LLC, et al. v. Wells Fargo Bank, N.A.